# Illinois Official Reports

## Appellate Court

---

### *In re Detention of Kelley*, 2019 IL App (1st) 162184

---

| | |
|---|---|
| Appellate Court Caption | *In re* DETENTION OF LEROY KELLEY (The People of the State of Illinois, Petitioner-Appellee, v. Leroy Kelley, Respondent-Appellant). |
| District & No. | First District, Fourth Division<br>Docket Nos. 1-16-2184, 1-17-1779 cons. |
| Filed | January 17, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CR-80003; the Hon. Timothy J. Joyce, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Daniel T. Coyne, Matthew M. Daniels, Michael R. Johnson, and Kate E. Levine, of Law Offices of Chicago-Kent College of Law, of Chicago, for appellant.<br><br>Lisa Madigan, Attorney General, of Chicago (David L. Franklin, Solicitor General, and Michael M. Glick and Brian McLeish, Assistant Attorneys General, of counsel), for the People. |
| Panel | PRESIDING JUSTICE McBRIDE delivered the judgment of the court, with opinion.<br>Justices Reyes and Burke concurred in the judgment and opinion. |

**OPINION**

¶ 1        Respondent, Leroy Kelley, brings this consolidated appeal, challenging two orders related to his commitment pursuant to the Sexually Violent Persons Commitment Act (Act) (725 ILCS 207/1 *et seq.* (West 2014)). Respondent first appeals the trial court's order denying his petition for discharge and granting the State's April 11, 2016, motion for a finding that no probable cause existed to believe he was no longer a sexually violent person. Respondent subsequently filed a second appeal from the trial court's order denying his motion to reconsider the prior judgment and granting the State's March 29, 2017, motion for a finding of no probable cause. Thereafter, on respondent's motion, the two matters were consolidated on appeal.

¶ 2        The record shows that respondent was previously convicted of committing rapes of two women in 1973. Respondent received a sentence of four to six years' imprisonment for each of the two rape offenses, to be served concurrently. It appears that respondent was paroled in 1977. He was subsequently convicted of committing deviate sexual assault later that same year and was sentenced to 40 years' imprisonment. In 2007, the State filed a petition to involuntary commit respondent as a sexually violent person under the Act.

¶ 3        The matter proceeded to a jury trial. The evidence presented at that trial was extensively set out in our decision in respondent's direct appeal, and we repeat that evidence here as it is relevant to the instant case:

> "At respondent's jury trial, the State presented the testimony of two expert witnesses: Dr. Ray Quackenbush and Dr. Steven Gaskell. Dr. Quackenbush testified that he was a licensed clinical psychologist employed by Affiliated Psychologists, Ltd. He was also approved by the Illinois Sex Offender Management Board to provide treatment and evaluation of sexual offenders. The trial court found the doctor to be an expert in the field of clinical psychology.
>
> Dr. Quackenbush testified that the [Department of Corrections] referred respondent for a full psychological evaluation to determine if he should be recommended for possible civil commitment as a sexually violent person, and the doctor was appointed to conduct that evaluation. As part of that evaluation, Dr. Quackenbush first reviewed respondent's master file, which was a 'complete set of documents dealing with his criminal history and his involvement with the Department of Corrections.' Among other things, the file included court records, victim statements, medical records and respondent's disciplinary history while in the DOC. All of these documents are reasonably relied upon by experts in conducting a sexually violent person evaluation. Dr. Quackenbush also interviewed respondent in December of 2006 at the Stateville Correctional Center for approximately 1 hour and 45 minutes. The doctor prepared a report after completing his evaluation on December 19, 2006. He then evaluated respondent again in April of 2007, which included updating his reading of respondent's master file and interviewing respondent again at the Dixon Correctional Center for 1 hour and 15 minutes. The doctor prepared a second report on April 18, 2007. Finally, to keep his opinion current for respondent's trial, Dr. Quackenbush reviewed additional documents as they became available, including records from the [Department of Human Services] treatment and detention facility where respondent was residing at the time of trial.

Dr. Quackenbush testified that in 1977 respondent was convicted of the sexually violent offense of deviate sexual assault and that the facts underlying that conviction were relevant to forming the doctor's opinion. In that case, respondent was on probation from another case when he confronted a woman exiting a garage. He put a knife to her throat and said, 'don't scream or I'll kill you.' He asked the woman for money, and when she said that she did not have any, he forced her to open the trunk of her car and stuffed a rag into her mouth. He then had her put his arms around him so it looked like they were together and they walked into her apartment. Respondent blindfolded the victim and took a number of items from her apartment. Respondent then opened his pants and showed the victim his penis and asked her to perform oral sex on him. She refused and respondent repeated his demand. When the victim again refused, respondent tied the victim's hands behind her back, placed her on the ground, and put a step ladder on top of her and left. After a jury convicted him of deviate sexual assault, respondent was sentenced to 40 years' imprisonment.

Dr. Quackenbush also considered the facts of two other sexually violent offenses for which respondent was convicted in 1973. In the first case, respondent and his brother and sister were walking down the street when they saw a woman they knew. Respondent forced the victim to the back of a building and then raped her. Afterwards, he told the victim he had been interested in her for some time and asked her to be his girlfriend. When respondent eventually let the victim leave, she went to her apartment and told her boyfriend what happened. When the boyfriend found respondent, respondent pulled a gun and then ran away. Respondent was convicted of rape in that case following a bench trial and was sentenced to four to six years' imprisonment.

Several months after this rape, respondent was arrested for another rape. In that case, respondent approached a vehicle containing two women and pulled a gun and entered the vehicle. After driving a short distance, respondent took both women out of the car and raped one of them in the backyard of a residence. He forced the women back into the car, drove a short distance, and then forced both women out of the car and raped them. Respondent pled guilty to rape and was sentenced to four to six years' imprisonment. Dr. Quackenbush testified that all three crimes were similar in that respondent used a weapon and forced the victim to engage in sexual activity against her will, and each had the potential to cause serious injury to the victim.

Dr. Quackenbush testified that in forming his opinion, he also considered the facts and circumstances of respondent's nonsexual criminal history. Respondent had an 'extensive criminal history,' including an arrest for burglary, an arrest and conviction for armed robbery, and an arrest and conviction for aggravated assault. During his interview, respondent also told Dr. Quackenbush about one sex crime that the doctor was unaware of. Respondent told Dr. Quackenbush that he was first arrested for statutory rape of his girlfriend when he was 19 and she was 16. When his girlfriend became pregnant, her father had respondent arrested but the charges were later dropped.

Dr. Quackenbush also considered the facts and circumstances of respondent's institutional adjustments in the DOC in forming his opinion in this case. Respondent had an 'extensive disciplinary history in the [DOC],' including over 250 disciplinary actions against him. This was an 'unusually high number,' even for someone serving a

long sentence. The facts of those disciplinary actions were important to the doctor. Several disciplinary actions were for sexual misconduct, and there were numerous disciplinary actions for fighting, intimidation or threats, arson, and throwing liquid on or attacking correctional officers. The sexual misconduct actions were important to the doctor because they occurred late in his sentence, and the most recent sexual misconduct occurred within two years of respondent's release from prison. In one instance, respondent was masturbating in front of a nurse and, in another, respondent forced an inmate to perform oral sex on him in a prison closet.

The doctor also considered the facts and circumstances of respondent's adjustment while on parole. Respondent had been on parole three times and he violated parole each time. His most recent sexual offense occurred while respondent was on parole for the two rape charges. While respondent was on parole the first time for his most recent conviction, he made threats against his 'host' and the staff of the DOC. He demanded money from his host and attempted to get her to go to the cash machine and get money. He also attempted to have her submit to a full-body massage. His host finally 'had enough' and went to the parole department. Respondent's parole was violated and he was returned to the DOC for six months. After he was again released on parole, respondent was hospitalized for a period of time for medical reasons. During his hospitalization, respondent was masturbating in his bed when a nurse walked into the room. He asked her to massage him and she refused. Respondent then wrote his phone number out and pressed it into the nurse's hand. On another occasion in the hospital, respondent propositioned a 14-year-old female hospital volunteer who entered his room. After she left his room, respondent tried to follow her down the hall shouting at and threatening her. Respondent's parole officer happened to visit the hospital shortly thereafter and was informed of the incident. Respondent was again returned to the DOC. Respondent kicked his parole officer in the chest and he also became violent while being transported to the DOC.

Dr. Quackenbush also considered that respondent did not participate in sexual offender treatment while in the DOC. Such participation is relevant to the doctor's evaluation. Respondent was offered treatment every year he was in the DOC but refused to participate. Respondent told the doctor that he did not need sexual offender treatment and that he felt getting treatment would interfere with getting his case back into court. On his second parole from his most recent case, respondent was required to attend outpatient sexual offender treatment. He had completed the entry evaluation to the program but he was terminated from the program when the program learned of his behavior at the hospital.

Respondent's behavior while in the DHS treatment and detention facility was also relevant to the doctor's evaluation. Respondent had attended an orientation group at the facility, which was positive, but he had thus far refused to enter into a core sex offender treatment program. Respondent had also exposed himself to staff members twice at the DHS facility.

Dr. Quackenbush used the Diagnostic and Statistical Manual of Mental Disorders IV (DSM-IV), which is the 'authoritative reference' in his field, as part of his evaluation of respondent. The doctor diagnosed respondent with paraphilia, not otherwise specified, nonconsenting persons. The doctor explained that 'the paraphilia

is the disorder' and that 'it's a deviant sexual practice or set of fantasies.' According to the doctor, there are approximately 300 named paraphilias, most of which are not given a specific individual diagnosis but, instead, are given the paraphilia 'not otherwise specified' (NOS) diagnosis. The 'non-consenting persons' diagnosis indicates what type of paraphilia it is. There are two criteria for a diagnosis of paraphilia NOS. The first is that the person has over a period of at least six months experienced either fantasies or sexual urges or behaviors involving sexual activity with a non-consenting person. In respondent's case, he had engaged in sexual activity with nonconsenting persons for approximately 39 years. The second criterion for the diagnosis is that the person must have either acted on his urges or fantasies and his sexual behavior has caused him to suffer a major dislocation or impediment in his life. In respondent's case, he had been incarcerated for most of his adult life as a result of his sexual behavior. Respondent's mental disorder is also a congenital or acquired condition affecting his emotional or volitional capacity that predisposes him to commit acts of sexual violence.

Respondent also has a history of being diagnosed with three different personality disorders in prison: antisocial personality disorder, scats-affective [*sic*][1] disorder and paranoid personality disorder. None of these diagnoses has predominated, so Dr. Quackenbush diagnosed respondent as suffering from a personality disorder, not otherwise specified, with paranoid scats-affective [*sic*] and antisocial features. Personality disorders are difficult to diagnose and therefore it was not unusual for respondent to have been diagnosed with different personality disorders from different evaluators in the past. In terms of the criteria for diagnosing these personality disorders, Dr. Quackenbush relied upon respondent's history of being diagnosed by the psychiatrists in the DOC. These personality disorders 'seriously exacerbate[ ]' respondent's paraphilia and 'contribute to his inability to control his urges and behaviors.'

Dr. Quackenbush also used several methods to evaluate respondent's risk of sexually reoffending. The first method used was an actuarial risk assessment. He explained that this involves considering things such as how many times the person has been arrested or convicted for a sexually violent crime, whether the victims were strangers or people known to the person, whether the victims were adults, male, female or children, and whether the person has been in treatment. All of the risk factors have been assigned statistical weights and those are added to arrive at a category of risk for the individual. In respondent's case, Dr. Quackenbush used two actuarial instruments: the Static-99 and the Minnesota Sex Offender Screening Tool Revised (MNSOST-R). Respondent scored in the 'high risk' category on the Static-99 and specifically scored a 9, which was 'one of the highest scores' the doctor had ever seen. That was also the 'highest score that in the research on the Static 99 was produced.' The doctor also stated that it was not unusual for evaluators using the Static-99 to arrive at different numbers because such a 'standard error' is built into all psychological tests.

---

[1]The opinion filed in respondent's direct appeal referred to respondent being diagnosed with "scats-affective" disorder. However, upon review of the record, it appears this was a typographical error and should have read "schizo-affective" disorder.

Respondent scored a 17 on the MNSOST-R, which placed him in the 'high risk' category.

Dr. Quackenbush also used the Hare Psychopathy Checklist, which is a personality test used to measure a very narrow personality trait, psychopathy. He explained that 'it's similar to anti-social personality disorder, but it's a more narrow concept and it involves a remorseless use of other people and leading a criminal lifestyle.' Respondent scored in the 96th percentile, meaning he has a 'higher degree of psychopathy than 96 percent of incarcerated prison inmates.'

Dr. Quackenbush also considered several dynamic risk and protective factors in respondent's case that 'can serve as targets for intervention and therapy.' He considered respondent's 'deviant sexual preference.' He also considered respondent's 'interpersonal difficulties, that he doesn't relate well to other people as shown by his criminal history and as shown by his disciplinary history in the [DOC]. And the notes from the treatment detention center also showed that he's had a lot of trouble getting along with other people there.' The doctor also considered respondent's age as a factor. This was 'very important' because for some individuals age can be a mitigating protective factor but this was not the case with respondent because his most recent sexual behavior with nonconsenting persons had been about a year before, and so respondent 'still seem[ed] to be very active in committing sex offenses.' Dr. Quackenbush also considered respondent's failure to complete a treatment program because research indicates 'that a good sex offender treatment program can reduce the likelihood of someone committing an act of sexual violence in the future.' Ultimately, all of the items the doctor considered in his risk assessment were consistent with respondent's total risk assessment and indicated that respondent was at a high risk of committing future acts of sexual violence.

Based upon all of his considerations, and in his opinion to a reasonable degree of psychological certainty, Dr. Quackenbush opined that it was substantially probable that respondent would commit future acts of sexual violence. By 'substantially probable,' the doctor meant 'much more likely than not.'

On cross-examination, Dr. Quackenbush acknowledged that respondent had not been charged with or convicted of any criminal offense since 1977. He also agreed that his understanding of respondent's parole violations was based entirely on records generated by parole officers.

The State's next witness was Dr. Steven Gaskell, a clinical and forensic psychologist who specialized in the assessment and treatment of mental disorders. Dr. Gaskell testified that he is also a registered evaluator with the Illinois Sex Offender Management Board. The trial court accepted Dr. Gaskell as an expert in the field of clinical psychology.

Dr. Gaskell evaluated respondent pursuant to a court order. He did not interview respondent because respondent would not participate in the interview. Dr. Gaskell testified that he considered respondent's master file as part of his evaluation, and his testimony regarding the facts and circumstances of respondent's criminal history was essentially the same as the testimony given by Dr. Quackenbush. He added that in the 1973 rape case, respondent beat and sexually assaulted the victim after telling the victim that he had a gun and that he would kill her if she did not submit to his sexual

advances. The doctor testified that in the 1977 case respondent forced the victim to perform oral sex on him. Regarding respondent's past nonsexual criminal history, Dr. Gaskell testified that in 1965, when respondent was 13 years old, he was convicted of aggravated assault and possession of a deadly weapon after he took a gun to school with the intent to kill a 16-year-old male who had been picking on him. Respondent had a 'run away charge' as a juvenile that was a violation of his probation. He was convicted of robbery in 1970 and he had a 'warrant failure' in the early 1970s. Respondent had another offense three weeks after the 1977 robbery and deviate sexual assault. It was a similar case in that he approached a woman and asked her for money. She said she did not have any money and respondent began to lead her down an alley until a car drove by and scared him off. He was convicted of attempted armed robbery and sentenced to 15 years' imprisonment.

Dr. Gaskell also considered respondent's behavior and the disciplinary actions taken against him in the DOC, and his testimony closely tracked the testimony of Dr. Quackenbush. He added that during respondent's 2005 parole, he went to the home of a DOC employee and harassed the employee's daughter. In November of 2005, he swore at an 'AMS operator' and on another occasion propositioned an AMS operator. An AMS operator is someone connected with respondent's parole. The final incident, described by Quackenbush, was when he tried to get his 'host' to submit to a body massage and then go to a cash machine and get him money. Dr. Gaskell also added that when respondent was on parole in 2006, he kicked the door in on the cage of the state vehicle taking him to prison and threatened to kill his parole officer and the officer's family. Like Dr. Quackenbush, Dr. Gaskell also considered respondent's behavior while in the DHS treatment and detention facility and his testimony was substantially the same as the testimony of Dr. Quackenbush.

Dr. Gaskell also employed the DSM-IV and diagnosed respondent with paraphilia, not otherwise specified, sexually attracted to nonconsenting females and antisocial personality disorder. These mental disorders predispose respondent to commit acts of sexual violence and were congenital or acquired conditions that affected his emotional or volitional capacity in that respondent 'has urges and fantasies to have sexual contact with non-consenting persons.' Respondent also has 'a failure to conform to social norms' so that 'he doesn't really have a filter or something that's going to stop him from making a different decision when he has those urges.' The doctor defined the antisocial personality disorder as 'a pervasive pattern of disregard for and violations of the rights of others occurring since at least the age of 15.' Dr. Gaskell also diagnosed respondent with cannabis abuse in a controlled environment and psychotic disorder, not otherwise specified.

The doctor acknowledged that respondent had not sexually attacked anyone while in custody but testified that this did not alter his opinion because 'it's a really infrequent event that someone would actually sexually assault someone within a facility.' Respondent also has not had the opportunity to arm himself within the DOC or the DHS treatment and detention facility.

Dr. Gaskell employed the Static-99 and respondent fell into the 'high risk' category for that test. Respondent scored an 8 on the Static-99 and other sexual offenders have an average score of 2. Dr. Gaskell also used the MNSOST-R and respondent again

placed in the 'high risk' range. The doctor then considered seven additional risk factors that pertained to respondent, including antisocial personality disorder, high score on the 'PCLR,' substance abuse, general self-regulation problems, impulsiveness, recklessness, any deviant sexual interests and employment stability. A consideration of these factors placed respondent at an even higher level of risk. The doctor did consider protective factors that could reduce respondent's risk of sexually reoffending. These included his age, his health, and any progress in sex offender treatment. However, respondent had refused to participate in sex offender treatment while in the DOC. In 2006, he was in treatment in Will County for five weeks but he had poor progress and was terminated from the program. Since that time, he has not participated in sex offender treatment in the DOC or in the DHS treatment and detention facility.

The doctor testified that in his opinion, to a reasonable degree of psychological certainty, it was substantially probable that respondent would commit future acts of sexual violence. According to the doctor, 'substantially probable' meant more likely than not.

The State concluded its case by presenting a stipulation that respondent had been convicted of three sexually violent offenses: (1) deviate sexual assault, in Cook County case number 77 I 40396, which resulted in a 40-year term of imprisonment; (2) rape, in Cook County case number 73 C 2980, for which he was sentenced to 4 to 6 years' imprisonment; and (3) rape, in Cook County case number 73 C 3176, for which he was sentenced to a term of 4 to 6 years' imprisonment to run concurrently with the sentence in case number 73 C 2980. The defense rested without presenting any evidence on respondent's behalf." *In re Commitment of Kelley*, 2012 IL App (1st) 110240, ¶¶ 5-29.

¶ 4 At the conclusion of the trial, the jury found respondent to be a sexually violent person based on the above evidence. Thereafter, following a dispositional hearing, the trial court ordered respondent committed to the Illinois Department of Human Services (DHS) for institutional care in a secure facility. *Id.* ¶ 30. Respondent's commitment was affirmed on direct appeal. *Id.* ¶ 51.

¶ 5 Respondent has been reexamined periodically since his initial commitment pursuant to section 55 of the Act (725 ILCS 207/55 (West 2014)).

¶ 6 On March 21, 2014, the State filed a motion for finding of no probable cause, attaching the March 11, 2014, reexamination report from Dr. Steven Gaskell. Dr. Gaskell reviewed various records in completing the evaluation, including prior examinations, court records, disciplinary records, and the DHS treatment plan. Dr. Gaskell noted that respondent had been informed of the reexamination, but declined to participate or meet with him.

¶ 7 Dr. Gaskell reviewed respondent's history of sexual offenses described above. Respondent had not been ticketed for any sexual offenses during the period under review, but he had received minor rule violations on two occasions for yelling at staff, refusing staff directives, and yelling obscenities.

¶ 8 Dr. Gaskell determined that respondent continued to "meet[ ] the DSM-5 diagnostic criteria" for "Other Specified Paraphilic Disorder, Sexually Attracted to Nonconsenting Females"; "Cannabis Use Disorder, In a Controlled Environment"; and "Antisocial Personality Disorder." He further stated that these "diagnoses are congenital or acquired conditions affecting his emotional or volitional capacity that predispose him to engage in acts of sexual violence."

¶ 9    Dr. Gaskell conducted a "risk analysis," using actuarial measures that help predict the risk of a sexually violent reoffense, which indicated that respondent was "at substantial risk of sexual re-offense." Respondent scored a four ("moderate-high risk") on the Static-99R, which Dr. Gaskell explained "f[e]ll into the 74.0 to 85.1 percentile," meaning that "74.0 to 85.1 percent of sex offenders in these samples scored at or below [respondent]'s score" and that the "recidivism rate for sex offenders with the same score as [respondent] would be expected to be approximately 1.94 times higher than the recidivism rate of the typical sex offender." Additionally, Dr. Gaskell found that respondent was "most similar to the preselected high-risk/high needs samples" and that "[o]ffenders with the same score as [respondent] from the preselected high-risk/high needs samples have been found to sexually reoffend at a rate of 20.1 percent in 5 years and 29.6 percent in 10 years."

¶ 10    On the Static-2002R, respondent scored a six ("moderate risk"), which Dr. Gaskell explained "f[e]ll into the 84.3 to 92.1 percentile," meaning that "84.3 to 92.1 percent of sex offenders in these samples scored at or below [respondent]'s score" and that the "recidivism rate for sex offenders with the same score as [respondent] would be expected to be approximately 2.63 times higher than the recidivism rate of the typical sex offender." Offenders "with the same score as [respondent] from the preselected high-risk/high needs samples have been found to sexually reoffend at a rate of 24.0 percent in 5 years and 33.8 percent in 10 years."

¶ 11    Regarding protective factors, Dr. Gaskell noted that participation in and successful completion of treatment can reduce a sex offender's recidivism risk. Respondent, however, had not participated in sex offense specific treatment since his admission to DHS in 2007. Respondent had participated in "some ancillary groups" but not within the "past couple years."

¶ 12    Dr. Gaskell also stated that respondent's then age of 62 years was a protective factor, and that it "likely reduces his risk to some degree," but that the results from the actuarial instruments already accounted for that factor.

¶ 13    Dr. Gaskell noted some of respondent's medical issues, including that, in his April 2013 resident review, respondent reported that he had prostate cancer. However, Dr. Gaskell concluded that respondent did not have a medical issue that would "warrant a reduction to his risk to sexually re-offend at this time."

¶ 14    Based on the above, Dr. Gaskell concluded, "to a reasonable degree of psychological certainty, that it is substantially probable that [respondent] will engage in acts of sexual violence in the future." Accordingly, the doctor recommended that respondent continue to be found to be a sexually violent person under the Act, and that he should remain committed to DHS "for further secure care and sexual offender treatment."

¶ 15    On April 16, 2014, respondent filed a petition for discharge. The trial court appointed an expert at respondent's request, but respondent did not ultimately submit an expert report.

¶ 16    On November 14, 2014, the trial court entered an order finding no probable cause to warrant an evidentiary hearing to determine whether respondent remained a sexually violent person, and granted the State's motion. Respondent did not appeal.

¶ 17    Dr. Gaskell completed an additional reexamination in March 2015, which was filed in the trial court along with the State's March 2015 motion for finding of no probable cause. In the report, Dr. Gaskell recommended that respondent continue to be found to be a sexually violent person and remain committed to the DHS. Dr. Gaskell continued to diagnose respondent with

"Other Specified Paraphilic Disorder, Sexually Attracted to Nonconsenting Females";
"Cannabis Use Disorder, In a Controlled Environment"; and "Antisocial Personality
Disorder"—diagnoses that "affect[ed] his emotional or volitional capacity that predispose him
to engage in acts of sexual violence."

¶ 18    In the March 2015 report, Dr. Gaskell continued to use the Static-99R and Static-2002R,
which resulted in scores of four ("moderate-high risk") and six ("moderate risk"),
respectively—the same scores as in the March 2014 report. Dr. Gaskell also noted that in the
year prior to the March 2015 report, respondent received a warning for disobeying a direct
order, two minor rule violations for insolence, and a major rule violation for interfering with
facility operations.

¶ 19    Regarding protective factors, Dr. Gaskell noted that respondent had still not participated in
sex offense treatment and that his age, 63, likely reduced his risk of reoffense "to some
degree," but that this factor was already "taken into account" on the actuarial instruments. Dr.
Gaskell further stated that respondent did not have a medical issue that would warrant a
reduction in his risk of reoffense.

¶ 20    While the State's 2015 motion for finding of no probable cause was still pending, the State
filed a new motion for finding of no probable cause on April 11, 2016, which attached the
March 2016 reexamination report of Dr. Gaskell. Dr. Gaskell recommended that respondent
continue to be found to be a sexually violent person. He continued to diagnose respondent with
the same mental disorders as in prior years.

¶ 21    Dr. Gaskell used the Static-99R and Static-2002R to evaluate respondent's risk of
recidivism. In the 2016 reexamination, respondent received scores of five ("moderate-high")
and five ("moderate") on the Static-99R and Static-2002R, respectively. Dr. Gaskell explained
that a score of five on the Static-99R "f[e]ll into the 84.6 to 92.5 percentile" meaning that "84.6
to 92.5 percent of sex offenders in these samples scored at or below [respondent]'s score" and
that the "recidivism rate for sex offenders with the same score as [respondent] would be
expected to be approximately 2.7 times higher than the recidivism rate of the typical sex
offender." Additionally, Dr. Gaskell found respondent to be "most similar to the preselected
high-risk/high needs samples" and "[o]ffenders with the same score as [respondent] from the
preselected high-risk/high needs samples have been found to sexually reoffend at a rate of 21.2
percent in 5 years and 32.1 percent in 10 years."

¶ 22    A score of five on the Static-2002R "f[e]ll into the 71.1 to 84.7 percentile," meaning that
"71.1 to 84.7 percent of sex offenders in these samples scored at or below [respondent]'s
score" and the "recidivism rate for sex offenders with the same score as [respondent] would be
expected to be approximately 1.9 times higher than the recidivism rate of the typical sex
offender." Additionally, Dr. Gaskell found respondent to be "most similar to the preselected
high-risk/high needs samples" and "[o]ffenders with the same score as [respondent] from the
preselected high-risk/high needs samples have been found to sexually reoffend at a rate of 19.1
percent in 5 years."

¶ 23    Moreover, Dr. Gaskell listed several additional risk factors that contributed to his risk of
sexual reoffense, including respondent's "deviant sexual interest," "Antisocial Personality
Disorder"; "Impulsiveness, recklessness"; and "substance abuse." Dr. Gaskell stated that these
factors were not measured by the risk assessment instruments described above, and based on
the above, he found respondent to be "at a substantial risk of sexual re-offense."

¶ 24    Regarding protective factors, Dr. Gaskell noted that respondent had still not participated in sex offense specific treatment as of the March 2016 report, but he had participated in some ancillary groups, specifically, an orientation group and anger management group. However, respondent's progress in treatment was not "sufficient to reduce his substantial risk for sexually violent re-offending." Dr. Glaskell also noted that in the year prior to the 2016 report, respondent received a major rule violation for interfering with facility operations.

¶ 25    Based on all of the above, Dr. Gaskell stated that it was his "professional opinion, to a reasonable degree of psychological certainty, that it is substantially probable [respondent] will engage in acts of sexual violence in the future."

¶ 26    On April 11, 2016, the same day the State filed its motion for finding of no probable cause, respondent filed a petition for discharge, asserting that he was no longer a sexually violent person. Respondent attached a report from Dr. Brian Abbott, dated March 15, 2016. Dr. Abbott stated that he conducted a psychological examination of respondent in a 90-minute "semi-structured clinical interview" on October 26, 2015. Dr. Abbott noted that medical records documented that respondent was being treated for prostate cancer. Respondent told Dr. Abbott that he received shots in his prostate, and he last received the injections in March 2015. The medical records available to Dr. Abbott also indicated that respondent was receiving monthly injections of "Lupron Depot," which is used to treat prostate cancer, and the injections were administered through March 31, 2015. Dr. Abbott stated that Lupron Depot lowers androgen levels, "which prevents the production of testosterone that is necessary for sexual arousal." Respondent reported to Dr. Abbott "an absence of sexual drive and sexual thoughts" since taking Lupron Depot.

¶ 27    Dr. Abbott concluded that respondent "no longer suffers from a legally defined mental disorder based on changes in circumstances associated with age-related modifications in his sexual and psychological functioning, and physical health." Regarding respondent's prior diagnoses of antisocial personality disorder (APD) and personality disorder with antisocial personality traits (APT), Dr. Abbott stated that records reflected "very few behavior problems" since respondent's commitment, and the "infrequent behavior problems" since his commitment do not "meet the enduring pattern of personality traits necessary to substantiate a personality disorder diagnosis." Dr. Abbott stated that this indicated that the conditions of APD and APT had "remitted related to certain psychological changes associated with aging." Dr. Abbott cited a study showing that those in the age group of 45-64 demonstrated a 62% rate of remission from antisocial personality disorder, while those in the age group of 65 and older exhibited remission at a rate of 78%. Dr. Abbott noted that respondent was 64 years old and would turn 65 years old in approximately six months.

¶ 28    Dr. Abbott acknowledged that respondent had exhibited "occasional bouts of angry verbal outbursts toward staff ranging between two to three times annually" but he attributed these outbursts to "irritability related to symptoms of major depressive disorder."

¶ 29    Dr. Abbott further stated that respondent had a "decline in sex drive and improved executive functions [judgment, reasoning and impulse control] associated with advancing age," noting that he had "not acted out in sexually inappropriate or criminal ways" since his commitment. Dr. Abbott stated that the combination of decline in sex drive and improved executive functions associated with advancing age resulted in "overall improvement in his interpersonal functioning" and an improvement in "the way that [respondent] manages his sexual urges."

¶ 30        Regarding respondent's prior paraphilia diagnosis, Dr. Abbott stated that respondent had demonstrated a change in his mental disorder, which was explained by "age related factors leading to the remission of deviant sexual behaviors." Respondent reported a decline in his sexual drive, and Dr. Abbott noted that his self-report was supported by records showing that he had not acted in sexually inappropriate or illegal ways and that he had not demonstrated "institutional signs" of paraphilia. Dr. Abbott stated that the decreases in respondent's "sexual drive has complemented the changes in his personality structure, which together best explain the change in his paraphilic condition since his commitment date." Dr. Abbott stated that his "improved executive functions" allowed respondent to better "deliberate over the consequences of his behavior before acting" and to "refrain from acting in sexually violent ways."

¶ 31        Dr. Abbott also cited "two health related circumstances that have secondary effects, which further contribute to the decline in [respondent]'s sexual drive." Specifically, respondent's sexual drive declined further due to taking Lupron Depot to treat prostate cancer. Dr. Abbott noted that if respondent stopped taking the medication, "sexual urges will re-emerge as his testosterone levels increase," but he stated that "given his age, his sexual drive will likely be low based on age related decreases in testosterone." Dr. Abbott also stated that respondent suffers from chronic back pain, and the "current intensity and chronicity of the physical pain *** inhibits the experience of sexual urges or thoughts because the physical pain overwhelms any pleasurable feelings associated with sexual urges or thoughts."

¶ 32        Additionally, Dr. Abbott concluded that, even assuming respondent suffered from a mental disorder, he "no longer presents as being substantially probable to commit acts of sexual violence." He stated that since respondent's trial in 2010, there had "been tremendous growth in the literature and science of sexual recidivism risk assessment," which demonstrated that respondent "no longer presents as substantially probable to commit acts of sexual violence."

¶ 33        Dr. Abbott determined that respondent's total score on the Static-99R was five, which he described as "within the moderate high score range." He noted that it was possible that respondent "may earn an additional point" based on sexual misconduct in prison with a male inmate, but that it was "unknown" based on the available information whether the acts would be considered as sexual offenses against the inmate. If respondent was assigned the additional point, his score would be a six, which would fall in the "high score" range.

¶ 34        Dr. Abbott found respondent to belong to the "Routine Corrections" reference group, and accordingly, his "Static-99R 5-Year Rate" or recidivism would be 15.2% based on a score of five, or 20.5% based on a score of six. He stated, however, that the Static-99R rates overestimate risk for older offenders based on an "over-representation by younger age offenders who sexually reoffend at higher rates."

¶ 35        After reviewing the above reports, the trial court held a hearing on respondent's petition for discharge and the State's motion for finding of no probable cause on June 17, 2016. The court returned for a ruling on June 21, 2016, and stated:

        "I have read the voluminous pleadings filed by the parties. *** I will note with respect to the expert appointed to represent or to evaluate [respondent] ***, Dr. Abbott, his lengthy report, it strikes me concentrates on his belief that the *** manner of assessing risk [to reoffend] has changed in his estimation. *** I talk about the actuarial assessments that are often utilized in an attempt to gauge or predict where someone lies on some spectrum regarding his likelihood to reoffend *** which is a difficult

- 12 -

circumstance in any event. In one in which there is considerable dispute with respect to psychiatrists and psychologists who utilize such information, and the attorneys who utilize such information in the context of this type of case.

Dr. Abbott further seems to claim *** that [respondent]'s risk has decreased and his risk has decreased *** [as] a function of the advancement of time, and certain medications that [respondent] purportedly takes relating to his treatment of prostate cancer, as well as the lack of apparent symptoms of any mental disorder, which so far as I can tell ***, if there is a lack of symptomology present of the mental disorder it seems to be a function of [respondent]'s inability to engage in those activities which lead to the diagnoses by the evaluator at the outset of this, and *** not so much of any particular change in circumstances brought on by [respondent] or thrusted upon [respondent] by treatment or otherwise. It seems to be a function of the fact that he's in custody and does not have the opportunity to engage in those activities, which gave rise to the diagnosis of a mental disease or mental disorder in the first instance, as well as the ultimate conclusion he was, in fact, a sexually violent person, as was concluded at the trial in this matter.

I would note further that the absence of any availing by [respondent] of any available treatment at the Department of Human Services facility *** similarly tends to indicate a lack of a change in circumstances ***.

And I just don't see that there is a change here. *** [A]lthough expertly presented, by both Dr. Abbott and [respondent's counsel], it strikes the Court that the circumstances put forth in support of the claim that [respondent] is no longer a sexually violent person, or [*sic*] simply *** a rehashing of the arguments that were made at the time that he was found to be a sexually violent person and, therefore, [I] do not think that [respondent] has presented plausible evidence that demonstrates a change in circumstances that lead [*sic*] to the initial finding *** that he was a sexually violent person."

¶ 36 The court entered a written order on June 27, 2016, "*nunc pro tunc* to June 21, 2016." In that written order, the court found no probable cause to warrant an evidentiary hearing to determine whether respondent was still a sexually violent person. The court granted the State's motion and denied respondent's petition "for the reasons stated on the record on June 21, 2016."

¶ 37 Respondent filed a timely notice of appeal on July 18, 2016, under appellate court No. 1-16-2184. Respondent filed his appellant's brief on May 2, 2017, and the State filed its appellee's brief on July 11, 2017.

¶ 38 Meanwhile, in the trial court, respondent filed a motion to conduct a reexamination of respondent "based on changes in his health." Respondent stated that he now required radiation therapy to treat his prostate cancer, which had progressed to a Gleason score—defined as "a scale from 2-10 designed to measure 'the relative aggressiveness of the cancer' and 'how far the cancer has progressed' "—of 7. Over the State's objection, the court entered an order on October 25, 2016, allowing Dr. Abbott to reexamine respondent.

¶ 39 On December 16, 2016, respondent filed a motion to reconsider the order of June 21, 2016. Respondent stated that since the time the court granted the State's motion, his "health has deteriorated to the point that he now requires radiation therapy to treat his prostate cancer." Respondent further stated that on December 12, 2016, Dr. Abbott authored a report in which he

- 13 -

continued to opine that respondent is no longer a sexually violent person and that his opinion was based on new evidence that was not previously available.

¶ 40 Dr. Abbott's report, which was attached, indicated that respondent had recently undergone eight weeks of radiation therapy. Dr. Abbott stated that respondent did not presently experience "sexual thoughts or urges in general or involving forcible or nonconsenting sexual acts." Respondent reported that his sexual functioning did not resume after the doctor discontinued the Lupron Depot medication and that he does not experience sexual urges "currently or since the examiner last saw him." Dr. Abbott indicated that respondent's self-reported loss of sexual drive was supported by respondent's oncologist, with whom Dr. Abbott had spoken. Respondent's oncologist advised Dr. Abbott that "patients who undergo the treatment [Respondent] received do not regain sexual functioning without the aid of medical intervention." Dr. Abbot noted that respondent had not had any medical intervention to regain sexual functioning and that respondent reported he had not had any "referrals to the behavioral committee" since Dr. Abbott's last examination. Dr. Abbott concluded that his updated evaluation did not change his "opinion that [respondent]'s mental disorder has changed since his commitment date [and] that he is no longer a sexually violent person" and that respondent "is no longer substantially probable to engage acts of sexual violence, assuming he suffers from the legally defined mental disorder."

¶ 41 On May 22, 2017, the State responded to respondent's motion to reconsider. The State asserted that Dr. Gaskell spoke to respondent's oncologist as well, who stated that "many times" patients do not regain functioning, estimating that it occurs in about 30% of patients. The oncologist further clarified that medical intervention meant medications such as "Viagra or Cialis," and the oncologist never asked respondent about his current sexual functioning. The oncologist also told Dr. Gaskell that the eight-week course of radiation treatment that respondent underwent "does not cause 100% loss of erection" and "there was no objective medical evidence to suggest that this treatment eliminated Respondent's sexual functioning."

¶ 42 On March 29, 2017, the State filed a motion for finding of no probable cause based on Dr. Gaskell's most recent March 2017 examination, which was attached to the motion. Dr. Gaskell's reexamination report was substantially similar to the prior reports. He confirmed that respondent had not been "seen by the Behavior Committee *** in the past year." In the 2017 reexamination, respondent received scores of five ("Above average risk") and four ("Average risk"), on the Static-99R and Static-2002R, respectively. These scores equated to five-year recidivism rates of 21.2% and 16%, respectively, which Dr. Gaskell believed "fairly represent[ed] the risk presented by respondent" at this time. Dr. Gaskell determined that "[n]o risk reduction [wa]s warranted based on his current health status" and continued to conclude that respondent was "at a substantial risk of sexual re-offense." Dr. Gaskell recommended that respondent continue to be found to be a sexually violent person, and remain committed to DHS.

¶ 43 On June 6, 2017, the trial court denied respondent's motion to reconsider, stating:

"I'm going to deny the motion. The reason I'm going to deny the well-stated motion *** relates to the fact that in the face of a claim that [respondent] doesn't have the wherewithal to engage in the physical act of—in particular, physical acts of sexual activity that would presumably require his ability—or relate to his ability to maintain an erection or get an erection, that's not the issue.

- 14 -

The issue is whether or not circumstances exist that would lead the Court to reasonably conclude that he is no longer a sexually-violent person. That does not depend on his physical ability to maintain or not maintain or get, to any particular extent, the physical act or the physical circumstance of an erect penis.

\*\*\*

[W]hen an individual is seeking a discharge hearing, it is the individual, in this instance [respondent]'s responsibility, to show that there is grounds to—for a court to conclude—or perhaps conclude that he's no longer a sexually-violent person. And that doesn't relate to whether or not someone can get an erection.

It relates to whether somebody has a mental disorder and, as a result of that mental disorder or condition, it is, therefore, substantially more probable that they would engage in acts of sexual violence. I don't doubt that there are all sorts of reasons that individuals engage in acts of sexual violence. It may well relate to their ability to maintain or get an erection, it may not.

And the fact that [respondent] seemingly has this circumstance relating to treatment for a prostate condition, cancer, which at the moment or at the time of treatment or will in the future prevent him, apparently, from maintaining an erection, does not by itself lead to a conclusion that, therefore, it is more probable than not that he is no longer a sexually-violent person.

It might well be a factor in the compendium of that but that by itself is not a reason that leads the Court to conclude that the circumstances have changed, so that [respondent] is now no longer a sexually-violent person. That's why I believe my denial of your motion was proper at the time I denied the motion for the petition for a discharge hearing and I believe it's the reason why I'm correct in denying your motion to reconsider."

¶ 44 Thereafter, regarding the State's motion for a finding of no probable cause, the trial court stated:

"I'm going to grant the State's motion for a finding of no probable cause and rule that there is no probable cause to warrant an evidentiary hearing as to whether [respondent] continues to be a sexually-violent person in need of treatment on a secure basis. That he shall remain in the Department of Human Services on a secure commitment order, as previously indicated. And that's because [respondent] has a long history of sexually offending and he has a long history of not taking any positive steps to do anything about that."

¶ 45 On June 30, 2017, respondent timely filed a notice of appeal, which was docketed as appellate court No. 1-17-1779. Respondent filed a motion to consolidate appeals in Nos. 1-16-2184 and 1-17-1779, contending that "the two appeals cover[ed] nearly identical topics" regarding the denial of respondent's petition for discharge and the denial of the motion to reconsider the same judgment. This court allowed the motion. At respondent's suggestion, the parties then filed supplemental briefs relating to the additional matters since the initial appeal, and respondent filed a consolidated reply and supplemental reply brief.

¶ 46 In this court, respondent contends that this court should reverse the trial court's judgment denying his petition for discharge and granting the State's motion for finding of no probable cause. Respondent asks us to remand this matter for an evidentiary hearing because the trial

- 15 -

court "erred in interpreting and applying Section 65 of the [Sexually Violent Persons Commitment] Act," concluding that there was no probable cause to believe that he is no longer a sexually violent person. Respondent alternatively contends that the due process clause of the fourteenth amendment requires an evidentiary hearing because there is substantial evidence to believe that there is no longer a basis to justify his commitment. Regarding the denial of his motion to reconsider on June 6, 2017, respondent contends that the court erroneously denied his motion to reconsider because there was probable cause to believe he was no longer a sexually violent person based on new facts concerning respondent's health and there was a "dispute" between Dr. Abbott and Dr. Gaskell "regarding the basis of their opinions."

¶ 47    This court has jurisdiction to review the circuit court's final judgment, entered *nunc pro tunc* to June 21, 2016, which denied respondent's petition for discharge and granted the State's motion for finding of no probable cause, pursuant to Illinois Supreme Court Rule 303 (eff. Jan. 1, 2015).

¶ 48    As to the trial court's order of June 6, 2017, we note that respondent's notice of appeal from that order lists the judgment appealed from as "Continued civil commitment as a sexually violent person; granting of State Motion for No Probable Cause Based on March 2017 Re-Examination Report; Denial of Motion to Reconsider the Order of June 21, 2016 Denying the Respondent's Petition for Discharge Without an Evidentiary Hearing," and the date of disposition is listed as "June 6, 2016." Respondent contends, and the State agrees, that the reference to a June 6, 2016, disposition is a typographical scrivener's error, and that the order respondent is actually appealing is dated June 6, 2017.

¶ 49    Based on the record, we find that respondent made a scrivener's error on the notice of appeal when referring to the disposition date. *Schaffner v. 514 West Grant Place Condominium Ass'n*, 324 Ill. App. 3d 1033, 1042 (2001). In *Schaffner*, this court defined a "scrivener" as a writer, and a "scrivener's error" as a clerical error resulting from a minor mistake or inadvertence when writing or when copying something on the record, including typing an incorrect number. *Id.* The scrivener's error does not inhibit this court's ability to ascertain from the record that respondent is appealing from the June 6, 2017, order. *State Security Insurance Co. v. Linton*, 67 Ill. App. 3d 480, 486 (1978) (the wrong date on a notice of appeal does not create a fatal defect when it is a typographical error). Accordingly, we find that the incorrect date on respondent's notice of appeal was a scrivener's error that did not create a fatal defect. *Id.* We thus conclude that we also have jurisdiction to consider the appeal from that order pursuant to Rule 303. Ill. S. Ct. R. 303 (eff. Jan. 1, 2015).

¶ 50    The Act allows for the involuntary commitment of "sexually violent persons" by the DHS for "control, care and treatment until such time as the person is no longer a sexually violent person." 725 ILCS 207/40(a) (West 2014). As relevant here, a "sexually violent person" is defined under the Act as "a person who has been convicted of a sexually violent offense, *** and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." *Id.* § 5(f). A "mental disorder" is a "congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." *Id.* § 5(b).

¶ 51    After a person has been committed under the Act, the State must submit a written report based on an evaluation of the individual's mental condition "at least once every 12 months after an initial commitment." *Id.* § 55(a). The primary purpose of the written report is to determine whether "(1) the person has made sufficient progress in treatment to be

- 16 -

conditionally released and (2) whether the person's condition has so changed since the most recent periodic reexamination *** that he or she is no longer a sexually violent person." *Id.*

¶ 52 At the time of the annual examination by the State, the committed person receives notice of the right to petition the court for discharge. *Id.* § 65(b)(1). If the committed person does not affirmatively waive that right, the court must set a probable cause hearing to determine whether facts exist that warrant a hearing on whether the respondent remains a sexually violent person. *Id.* "However, if a person has previously filed a petition for discharge without the Secretary's approval and the court determined, either upon review of the petition or following a hearing, that the person's petition was frivolous or that the person was still a sexually violent person, then the court shall deny any subsequent petition under this Section without a hearing unless the petition contains facts upon which a court could reasonably find that the condition of the person had so changed that a hearing was warranted." *Id.*

¶ 53 For a respondent to receive an evidentiary hearing under section 65(b)(2) of the Act, the court must find a plausible account exists that the respondent is no longer a sexually violent person. *Id.* § 65(b)(2). In a discharge proceeding, this means that the committed individual must present sufficient evidence that he no longer meets the following elements for commitment: (1) he no longer has "a mental disorder" or (2) he is no longer dangerous to others because his mental disorder no longer creates a substantial probability that he will engage in acts of sexual violence. *Id.* § 5(f); *In re Detention of Stanbridge*, 2012 IL 112337, ¶¶ 68, 72. "In making that determination, the trial judge must consider all reasonable inferences that can be drawn from the facts in evidence." (Internal quotation marks omitted.) *In re Detention of Hardin*, 238 Ill. 2d 33, 48 (2010). However, at this stage of the proceedings, the role of the trial court is not to "choose between conflicting facts or inferences" (internal quotation marks omitted) (*id.*) or to engage in a "full and independent evaluation of [an expert's] credibility and methodology" (*id.* at 53). The trial court "should not attempt to determine definitively whether each element of the [movant's] claim can withstand close scrutiny as long as some 'plausible' evidence, or reasonable inference based on that evidence, supports it." *Id.* at 51-52. This court reviews the ultimate question of whether respondent established probable cause *de novo*. *In re Detention of Lieberman*, 2011 IL App (1st) 090796, ¶ 40. If the court finds probable cause to believe that the committed person is no longer a sexually violent person, it must set a hearing on the issue and the State has the burden of proving by clear and convincing evidence that the person is still a sexually violent person. 725 ILCS 207/65(b)(2) (West 2016).

¶ 54 Postcommitment probable cause hearings are "intended to be preliminary in nature, a 'summary proceeding to determine essential or basic facts as to probability' *** while remaining cognizant of the respondent's liberty rights." *Hardin*, 238 Ill. 2d at 52 (quoting *State v. Watson*, 595 N.W.2d 403, 420 (Wis. 1999)). As a result, a probable cause determination requires a " 'relatively low' " quantum of evidence as support. *In re Detention of Hayes*, 2015 IL App (1st) 142424, ¶ 18 (quoting *Hardin*, 238 Ill. 2d at 52). As the supreme court stated in *Stanbridge*:

> "To allow the trial judge to weigh conflicting evidence and choose between expert opinions at this 'summary proceeding' would be beyond the scope of the limited inquiry intended at a probable cause hearing and would render meaningless and unnecessary the subsequent sections of the Act providing for a full hearing or trial. The probable cause hearing is not a substitute for a full evidentiary hearing where disputed

questions of fact can be resolved by the trier of fact, and where the basis for the opinions and credibility determinations can be fully explored." *Stanbridge*, 2012 IL 112337, ¶ 64.

¶ 55     We will first consider respondent's appeal of the June 21, 2016, order, denying his petition for discharge and granting the State's 2016 motion for a finding of no probable cause, before turning to the appeal of the June 6, 2017, order, denying his subsequent motion to reconsider that judgment and granting the State's 2017 motion for a finding of no probable cause.

¶ 56     Regarding the initial order of June 21, 2016, respondent argues that there is probable cause to believe that he is no longer a sexually violent person, based on the report of Dr. Abbott, and contends that this court should not choose "between conflicting facts and inferences" in the expert reports prior to an evidentiary hearing. Respondent contends that there is probable cause to believe that he is no longer a sexually violent person because he has not engaged in sexual misconduct since being committed, he has demonstrated that he can control his behavior, and his increasing age has caused his risk of re-offense to "plummet[ ]." The State, however, contends that the trial court correctly determined that no probable cause existed to believe that respondent is no longer a sexually violent person.

¶ 57     As an initial matter, respondent and the State disagree regarding what evidence was properly before the trial court on this issue. The parties' disagreement stems from the 2012 amendment to the petition for discharge statute, which added the language "since the most recent periodic reexamination" to the statute. See Pub. Act 97-1075 (eff. Aug. 24, 2012) (amending 725 ILCS 207/65(b)(2)).

¶ 58     The State points out that, pursuant to section 65(b)(2), the circuit court must determine whether "facts exist to believe that *since the most recent periodic reexamination* *** the condition of the committed person has so changed that he or she is no longer a sexually violent person." (Emphasis added.) 725 ILCS 207/65(b)(2) (West 2014). The State relies on this language to contend that the court is concerned only with changes in circumstances since "the most recent periodic reexamination," and therefore, we should look only to whether there have been sufficient changes since November 2014, the last time the trial court found no probable cause to believe that respondent was no longer a sexually violent person. The State contends that the reports showed that respondent's condition and behavior had not changed in any significant way since that time, and that the differences in Dr. Gaskell's and Dr. Abbott's methodologies are not due to post-2014 changes in professional knowledge. The State further argues that Dr. Abbott's "mere[ ] disagree[ment]" with Dr. Gaskell's approach is not sufficient to warrant a hearing.

¶ 59     Respondent, however, contends that the report of Dr. Abbott shows that his condition has changed since he was found to be a sexually violent person in 2010. Respondent argues that the State's interpretation of section 65 is inconsistent with the supreme court's decision in *Stanbridge*, 2012 IL 112337, and was previously rejected by this court in *In re Commitment of Rendon*, 2017 IL App (1st) 153201. Respondent further argues that the State's interpretation would result in the statute being unconstitutional.

¶ 60     This issue was previously considered by this court in *Rendon*, 2017 IL App (1st) 153201. In *Rendon*, the committed person challenged the 2012 amendment to section 65, adding the language "since the most recent periodic reexamination," arguing that the amendment was "unduly restrictive, forcing a petitioner to essentially rely *only on facts* occurring since the *most recent reexamination*, within the preceding year." (Emphases in original and internal

quotation marks omitted.) *Id.* ¶ 21. The respondent further argued that the amendment had "a retroactive effect" and that the court should "apply the pre-amendment statute." *Id.*

¶ 61 This court, however, disagreed with the committed person's interpretation of the amendment, determining that the amendment "did not preclude consideration of a respondent's full mental health and sexual history or relevant historical facts." *Id.* ¶ 23. "Construing the statute logically, it simply means the court must consider the professional conclusions as to a respondent's status in the most recent report and any changed circumstances." *Id.* The court determined that the amendment was "simply a clarification of what the circuit court was already tasked with determining in any case involving application for discharge or conditional release—*i.e.*[,] whether the respondent's *current status* reflects a mental disorder or that he is *still* a danger to society such that he is substantially probable to reoffend." (Emphases in original.) *Id.*

¶ 62 Based on this standard, we conclude that respondent has met his "very low burden" to show probable cause to advance to an evidentiary hearing. *Id.* ¶ 29 (citing *In re Commitment of Wilcoxen*, 2016 IL App (3d) 140539, ¶ 30).

¶ 63 In Dr. Abbott's report, he determined that respondent "no longer suffers from a legally defined mental disorder based on changes in circumstances associated with age-related modifications in his sexual and psychological functioning, and physical health." He believed that respondent's previously-diagnosed antisocial personality disorder had remitted, due to "psychological changes associated with aging," and that his "infrequent behavior problems" since his commitment did not "meet the enduring pattern of personality traits necessary to substantiate a personality disorder diagnosis." Regarding the prior paraphilia diagnosis, Dr. Abbott also believed that there had been a demonstrated change in his mental disorder, which was explained by "age related factors leading to the remission of deviant sexual behaviors." Respondent reported a decline in his sexual drive, and Dr. Abbott noted that respondent's self-report was supported by records showing that he had not acted in sexually inappropriate or illegal ways since his commitment and that he had not demonstrated "institutional signs" of paraphilia. Respondent's decline in sex drive and improved executive functions associated with advancing age resulted in "overall improvement in his interpersonal functioning," allowing respondent to better "deliberate over the consequences of his behavior before acting" and to "refrain from acting in sexually violent ways."

¶ 64 Dr. Abbott also concluded that, even assuming respondent suffered from a mental disorder, he "no longer presents as being substantially probable to commit acts of sexual violence." Based on his Static-99R analysis, he found a five-year rate of recidivism between 15.2% and 20.5%. Dr. Abbott stated, however, that the Static-99R rates overestimate risk for older offenders based on an "over-representation by younger age offenders who sexually reoffend at higher rates."

¶ 65 Although a comparison of Dr. Gaskell's and Dr. Abbott's reports indicate that the experts substantially disagree on several issues, we will not "weigh conflicting evidence and choose between expert opinions" at this preliminary stage. *Stanbridge*, 2012 IL 112337, ¶ 64. Based on the above report of Dr. Abbott, we conclude that respondent has provided at least the " 'relatively low' " quantum of evidence necessary to support a probable cause hearing. *Hayes*, 2015 IL App (1st) 142424, ¶ 18 (quoting *Hardin*, 238 Ill. 2d at 52).

¶ 66 Having so found, we turn to respondent's appeal of the June 6, 2017, order, denying his subsequent motion to reconsider that judgment and granting the State's 2017 motion for a

finding of no probable cause. Since we have already found that respondent is entitled to a hearing based on the record from respondent's initial petition for discharge in 2016, we consider whether there is anything in the record from the subsequent proceedings that would impact our conclusion.

¶ 67 As an initial matter, the State contends that the trial court lacked jurisdiction to consider respondent's motion to reconsider, since it was untimely pursuant to section 2-1203 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1203(a) (West 2014)). Respondent asserts that his motion did not cite section 2-1203 of the Code and that it did not provide the basis for his motion to reconsider. Respondent contends instead that he brought his motion to reconsider "pursuant to the Act."

¶ 68 Section 20 of the Act provides that proceedings under the Act are "civil in nature" and that the Code "shall apply to all proceedings hereunder except as otherwise provided in this Act." 725 ILCS 207/20 (West 2014); see also *People v. Miller*, 2014 IL App (1st) 122186, ¶ 20 ("the provisions of the Code apply to commitment proceedings only where they do not conflict with the Act"). Additionally, pursuant to section 2-1203 of the Code (735 ILCS 5/2-1203(a) (West 2014)), in nonjury cases, a party has 30 days after the entry of the judgment to file a motion to reconsider.

¶ 69 Respondent contends that section 2-1203 of the Code does not apply to his motion to reconsider because it was filed pursuant to the Act itself. Respondent contends that section 2-1203 conflicts with section 55(c) of the Act, which provides that a court may order a reexamination of the committed person "at any time during the period in which the person is subject to the commitment order." 725 ILCS 207/55(c) (West 2014). We are unconvinced.

¶ 70 The Act's provision that a court may order a reexamination of a committed person is independent of, and does not conflict with, the Code's requirement that motions to reconsider must be brought within 30 days of the judgment. Respondent could, and indeed did, petition the court to allow such a reexamination pursuant to section 55(c), without filing a motion to reconsider. We also note that section 2-1203 of the Code has been previously applied in a case arising from the Act. See *In re Commitment of Simons*, 2015 IL App (5th) 140566, ¶ 18.

¶ 71 Accordingly, we determine that section 2-1203 of the Code applies to respondent's motion to reconsider. Because respondent filed his motion to reconsider the order of June 21, 2016, approximately six months later—on December 16, 2016—respondent's motion was untimely under section 2-1203 of the Code and the trial court had no jurisdiction to hear it. *Lampe v. Pawlarczyk*, 314 Ill. App. 3d 455, 475 (2000); *Beck v. Stepp*, 144 Ill. 2d 232, 238 (1991) ("trial court loses jurisdiction to vacate or modify its judgment 30 days after entry of judgment [citations] unless a timely post-judgment motion is filed"); *In re Application of the County Treasurer & Ex-Officio County Collector*, 208 Ill. App. 3d 561, 563-64 (1990) (trial court's denial of motion to reconsider is void for lack of jurisdiction where motion itself was untimely filed).

¶ 72 Although we agree with the State that the trial court lacked jurisdiction to consider respondent's untimely motion to reconsider, the issue is moot, in any event, since we have already concluded that respondent is entitled to a hearing based on the record from respondent's initial petition for discharge in 2016. Moreover, the court unquestionably had jurisdiction to consider the State's annual motion for finding of no probable cause, filed March 29, 2017. Accordingly, we will consider the evidence presented at the hearing on the State's motion.

¶ 73    In addition to Dr. Abbott's initial report, outlined above, the additional report of Dr. Abbott, dated December 12, 2016, lends further support to our conclusion that respondent met his burden. In that report, Dr. Abbott continued to opine that respondent was no longer a sexually violent person. Dr. Abbott's opinion was supported, in part, by new evidence since the prior annual reexamination, specifically, that respondent had recently undergone "eight weeks of radiation therapy" and that respondent's oncologist advised Dr. Abbott that "patients who undergo the treatment that [respondent] received do not regain sexual functioning without the aid of medical intervention." Dr. Abbott further indicated that respondent had not had any medical intervention to regain sexual functioning and that he did not presently experience "sexual thoughts or urges in general or involving forcible or nonconsenting sexual acts."

¶ 74    Given Dr. Abbott's 2016 initial report, and the additional support provided in his 2017 reexamination report, we conclude that respondent is entitled to an evidentiary hearing to determine whether he is still a sexually violent person as defined by the Act. See *Rendon*, 2017 IL App (1st) 153201, ¶ 32 (finding the respondent to have presented "sufficient evidence to show probable cause for an evidentiary hearing" in light of respondent's age, low recidivism rate on the Static-99R, and participation in treatment).

¶ 75    Accordingly, we remand this matter for the trial court to conduct an evidentiary hearing to determine whether respondent remains a sexually violent person. At this hearing, the parties can raise the various matters at issue in each of these consolidated proceedings, including the conflicting expert reports from 2016 and 2017, and the fact finder can determine the credibility and weight to be given to the experts' testimony and opinions. We express no opinion on whether respondent or the State will ultimately prevail after an evidentiary hearing.

¶ 76    In light of the above, we need not reach respondent's alternative argument, that an evidentiary hearing is constitutionally required by the due process clause of the fourteenth amendment to the United States Constitution. See *In re E.H.*, 224 Ill. 2d 172, 178 (2006) ("cases should be decided on nonconstitutional grounds whenever possible, reaching constitutional issues only as a last resort").

¶ 77    Based on the foregoing, we reverse the judgment of the trial court finding no probable cause for an evidentiary hearing. We remand the case for further proceedings consistent with this opinion.

¶ 78    Reversed and remanded.