2020 IL App (1st) 190985-U

FIRST DISTRICT,
FIRST DIVISION
November 23, 2020

No. 1-19-0985

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| IN RE THE COMMITMENT OF VINCENT PIERONI | ) ) ) | |
| (PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County, Illinois. |
| Petitioner-Appellee, | ) ) | |
| v. | ) ) | No. 05 CR 80008 |
| VINCENT PIERONI, | ) ) ) | Honorable Peggy Chiampas, Judge Presiding. |
| Respondent-Appellant.) | ) ) | |

_____

JUSTICE COGHLAN delivered the judgment of the court.
Presiding Justice Walker and Justice Hyman concurred in the judgment.

**ORDER**

¶ 1   *Held*:  Respondent presented sufficient evidence to show probable cause to warrant an evidentiary hearing pursuant to 725 ILCS 207/65(b)(2) and 725 ILCS 207/60(c).

¶ 2   Respondent, Vincent Pieroni, was adjudicated a sexually violent person (SVP) under the Sexually Violent Persons Commitment Act (the Act) (725 ILCS 207/1 (West 2006)) and committed to the custody of the Department of Human Services (DHS) in March 2006, following

his stipulation to the State's petition for commitment. Respondent now appeals the trial court's judgment granting the State's motion for a finding of no probable cause and denying his petition for conditional release without an evidentiary hearing. For the following reasons, we reverse.

¶ 3 BACKGROUND

¶ 4 In April 2004, the State petitioned to have respondent committed as an SVP based on his convictions for sexually violent offenses against young males, to wit: in 1988, respondent was sentenced to seven years in the Illinois Department of Corrections (IDOC) for sexually abusing two male children, ages 8 and 10. While on parole in 1992, respondent sexually reoffended and was sentenced to two years imprisonment and two years of probation. In 1993, while on probation for the 1992 offense, respondent committed and later pled guilty to sexually abusing four male children. He was sentenced to 20 years in IDOC for the first case and 14 years in IDOC for three remaining offenses, to run concurrently with his other sentences.

¶ 5 Respondent was placed on Mandatory Supervised Release (MSR) and transferred to the Illinois Department of Human Services Treatment and Detention Facility (TDF) pending a hearing on the State's petition. On June 8, 2004, respondent's MSR was revoked after he punched a TDF staff member during an altercation with another resident. The State withdrew its commitment petition at that time.

¶ 6 In December 2005, as respondent's release from IDOC custody was approaching, the State once again petitioned to commit respondent under the Act. The petition was supported by a 2004 examination report from Joseph W. Proctor, Psy. D, as well as a 2005 addendum, in which Dr. Proctor diagnosed respondent with (1) pedophilia, sexually attracted to males, non-exclusive type, and (2) polysubstance dependence, in a controlled environment.

¶ 7        Respondent refused to participate in the interview process with Dr. Proctor. In a prior psychological evaluation, respondent related that he dropped out of school in the 8th grade and got his GED in prison. He admittedly had a history of substance abuse and denied having ever participated in any drug or alcohol treatment programs. Respondent reported that he had been previously admitted to psychiatric hospitals on two occasions and took psychotropic medications most of his life.

¶ 8        Dr. Proctor detailed respondent's criminal sexual history as follows. In 1988, respondent was convicted of aggravated criminal sexual assault involving 8-year-old and 10-year-old male victims. Respondent rubbed the 8-year-old victim's stomach with his penis, put his penis between the victim's legs, and tried to insert his penis in the victim's butt. On multiple occasions, respondent fondled the victim's penis while the victim was dressed and lured the victim to his home where he placed his penis into the victim's anus. In May 1987, respondent was babysitting both victims when he grabbed and fondled the 10-year-old victim's penis. Respondent was 21 years old at the time of these offenses.

¶ 9        While on parole in 1992, respondent reoffended and was sentenced to two years' jail time and two years' probation. Dr. Proctor did not elaborate on the details of the 1992 conviction. While on probation in 1993, respondent befriended three young boys at a neighborhood church and lured them to his apartment where he molested them. On 20 separate occasions, respondent fondled a 13-year-old victim's penis and testicles inside his underpants. He then threatened the victim not to talk and told him that he had gone to prison for shooting someone and would do it again.

¶ 10       Respondent forcibly penetrated another 13-year-old victim's anus with his penis, masturbated him and forced him to touch respondent's penis. Respondent then threatened him not to tell anyone and told him he had killed before and would do it again. In a third case, respondent

persuaded a 12-year-old boy to sleep over at his apartment, where he fondled the victim's penis and testicles while he was sleeping. Respondent threatened the victim not to tell anyone, stating that he had been in prison for shooting a man and he would do it again. In a fourth case, respondent persuaded a 16-year-old boy to sleep over at his apartment, where respondent rubbed his penis between the victim's legs and fondled the victim's penis and testicles. In yet another case, respondent persuaded the victim to anally penetrate respondent with the victim's penis.

¶ 11    Respondent's file did not indicate that he participated in sex offender specific treatment during his incarceration. Dr. Proctor completed the "Hare Psychopathy Checklist – Revised (PCL-R)," a standardized ratings scale of psychopathic personality traits. Respondent's cumulative score of 17 indicated that he manifested a moderate degree of psychopathic personality traits relative to incarcerated adult male offenders.

¶ 12    Respondent scored a 5 out of 12 on the Static-99 test, which suggested that his risk of recidivism was "moderate to high." Dr. Proctor also considered "empirically derived static and dynamic risk factors" not accounted for by the Static-99, which he believed further increased respondent's risk to reoffend. Specifically, Dr. Proctor emphasized that offenders who have prior sexual offenses against two or more children under the age of 12, have deviant sexual interests, and who have violated conditions of parole are more likely to sexually reoffend than those who have not. Dr. Proctor also found it noteworthy that respondent had not participated in any treatment for anger, sex offending, or substance abuse during his incarceration.

¶ 13    Possible protective factors existed that might have attenuated respondent's risk of sexual recidivism, such as his sexual attraction to age appropriate females and that he was over the age of 25, but ultimately Dr. Proctor opined that his risk factors presented a high risk of sexual

reoffending. Dr. Proctor concluded that respondent's mental disorders made it substantially probable that he would engage in future acts of sexual violence.

¶ 14    In March 2006, respondent was committed to TDF following his stipulation to the State's petition. Respondent was periodically reevaluated, pursuant to section 55 of the Act and, each time, the trial court found no probable cause to hold an evidentiary hearing. On September 30, 2015, the state moved for a finding of no probable cause, supported by a September 7, 2015 annual reexamination report issued by DHS evaluator Kimberly Weitl, Psy.D. Respondent refused to meet with Dr. Weitl for purposes of the evaluation. Dr. Weitl opined that respondent continued to suffer from (1) pedophilic disorder, sexually attracted to males in a controlled environment and (2) other specified paraphilic disorder, non-consenting adolescents. Because of his mental disorders, Dr. Weitl concluded that it was substantially probable that he would engage in future acts of sexual violence.

¶ 15    In sum, Dr. Weitl made the following findings in her 2015 reexamination report, using court and TDF records, respondent's prior psychological examinations, and empirical screening tools. Respondent reported having been physically abused by his parents and molested as child. He was never gainfully employed and "stole, sold drugs, and engaged in a prostitution ring" as a means of financial support. He was psychiatrically hospitalized on two occasions and had been prescribed psychotropic medications for most of his life. Respondent acknowledged that he had a history of substance abuse and never participated in substance abuse treatment. Respondent had an extensive history of criminal sexual behavior and nothing in Dr. Weitl's records indicated that he participated in sex offender or substance abuse treatment while incarcerated. Respondent received 48 disciplinary tickets during his incarceration, two of which were for sexual misconduct.

¶ 16    The TDF Sex Offender Treatment Program consists of five phases. At the time of his 2015 reexamination, respondent had only participated in the "Treatment Foundations" group, which is designed to prepare residents for sex offender specific treatment. He had not yet completed the first phase of treatment and refused to complete psychological and psychosexual tests administered to residents to assist in developing their treatment plans. Intelligence testing revealed that respondent had an IQ score of 80 (low average) and, while he was honest about having molested several male children, he used "justifications and excuses to keep from accepting full accountability for his sexually assaultive behaviors." Respondent sporadically attended his treatment foundations groups and his "commitment to change" was "minimal as evidenced by his lack of participation and effort in therapy."

¶ 17    Dr. Weitl used an "adjusted actuarial assessment" to assess respondent's risk of recidivism, which consisted of a Static-99R test and consideration of other empirical risk factors. Respondent scored a five on the Static-99R, placing him in the "moderate high risk" recidivism category. Dr. Weitl noted that various other factors further increased his risk of recidivism including his deviant sexual interests, multiple paraphilic disorders, that he was unsuccessful with supervised release, substance abuse, and lack of treatment motivation. Dr. Weitl acknowledged that recidivism rates can decrease after the age of 40; however, she noted that offenders who molest children frequently continue to offend well into their 60s. Based on the foregoing considerations, Dr. Weitl opined that respondent's condition had not changed since his last reexamination and that he should continue to be found an SVP and remain committed to TDF.

¶ 18    The court appointed Brian R. Abbott, Ph.D. as respondent's expert at respondent's request on December 16, 2015. While the State's 2015 motion was pending before the court, the State filed another motion for finding of no probable cause on October 4, 2016, supported by a

September 6, 2016 reexamination report issued by Dr. Weitl. Once again, respondent refused to meet with Dr. Weitl for the examination. In the year preceding the 2016 reexamination, respondent received two rule violations after becoming aggressive and threatening with TDF staff. On July 19, 2016, respondent received a major rule violation after he was caught in possession of a game system containing several movies depicting nudity and sexual scenes, including a rape scene. Respondent blamed his roommate for downloading some of the images but admitted that he asked someone to add more unapproved movies to the game system.

¶ 19    Regarding treatment, respondent was still sporadically attending foundational groups and reported that he "had some fetishes he needed to deal with," which were barriers to his treatment progress. In April 2016, he reported that he was not ready to transition to "Disclosure Group," because there were things that he was not ready to talk about.

¶ 20    Dr. Weitl concluded that respondent's condition had not changed since his last reexamination and he had not made sufficient progress in treatment to be conditionally released. Her diagnoses and recommendations remained the same as those contained in her 2015 reexamination.

¶ 21    On March 27, 2017, Respondent petitioned the court for conditional release. The petition was supported by a December 26, 2016 report from Dr. Brian Abbott, in which he concluded that "to a reasonable degree of psychological certainty *** Mr. Pieroni no longer suffers from a legally defined mental disorder based on changes in circumstances associated with age-related modifications in his sexual and psychological functioning and change resulting from his progress in treatment." Dr. Abbott also concluded that, assuming respondent continued to suffer from a mental disorder, "it no longer creates a substantial probability that he will engage in acts of violence" due to "circumstances associated with age-related alterations in his sexual and

psychological functioning, changes in professional knowledge used to evaluate the [r]espondent's risk of reoffending, and his progress in treatment." Dr. Abbott's report was prepared using a variety of sources, including: a two-hour interview with respondent, respondent's personal and criminal history, psychiatric evaluations, DHS treatment progress reports, medical and mental health records, and Static-99R and Stable-2007 evaluations.

¶ 22       A lengthy recital of respondent's upbringing, substance abuse, and criminal history was included in the report. At the time of Dr. Abbott's interview, respondent was 50 years old and participating in ancillary treatment groups, progressing to phase two: accepting responsibility. He meaningfully participated in case management sessions with his primary therapist and "gained both a cognitive and emotional understanding of how he was affected by his sexual victimization [as a child]." This, along with the psychotropic medication he was taking, allowed him to "manage his intense emotional reactions related to PTSD." Dr. Abbott noted that "a turning point in the [r]espondent's recovery occurred when he made the cognitive and emotional realization that the victims he sexually abused felt the same trauma that he experienced when being sexually victimized" and "[r]ather than responding with sexual excitement to thoughts about sexual involvement with prepubescent males, Mr. Pieroni now feels guilty and ashamed." According to Dr. Abbott, respondent's empathy for his victims and understanding of the motivations for his sexual offending behavior are clinically associated with a reduced risk for sexual re-offense.

¶ 23       Respondent reported that he had not used drugs or alcohol since his admission to TDF. He told Dr. Abbott that the psychotropic medication he was taking stabilized his psychological functioning so that he no longer needed to resort to substance use to "anesthetize the psychological distress he has felt regarding his sexual victimization." Psychiatric notes from 2015 showed that respondent did not report sexually deviant fantasies and masturbated once every three to four

months. He told Dr. Abbott that he had not masturbated in three years, although Dr. Abbott noted that this was likely inaccurate. Respondent admittedly incurred a major violation for possessing a game system that contained sexually explicit movies on the same day as his interview with Dr. Abbott.

¶ 24    Respondent was being treated for angina, hypertension, diabetes, high cholesterol, hypothyroidism, and sleep apnea at the time of Dr. Abbott's evaluation. He reported that his sexual drive had diminished over time, which was consistent with advancing age and a side effect of the Prozac he was prescribed. He had "not experienced recurrent, intense, sexually arousing urges or sexual fantasies involving prepubescent males since his commitment date." His self-report was supported by TDF records. Based on the foregoing, Dr. Abbott concluded that respondent "no longer feels the press to immediately satisfy his sexual drive so that he can deliberate sufficiently to inhibit the expression of any pedophilic urges he might feel in the future."

¶ 25    Respondent also "demonstrated improvement in his judgment, reasoning, and impulse control *** associated with advancing age." Respondent had engaged in fights with residents and had occasional verbal outbursts at staff, but Dr. Abbott attributed the outbursts to anxiety and mood disturbance associated with PTD and noted that respondent did not act in sexualized ways to cope. He concluded that "the absence of [r]espondent coping with psychological distress through institutional signs of pedophilic disorder indicates that he has adequate control over engaging in sexually violent acts."

¶ 26    Dr Abbott asserted that "there has been tremendous growth in the literature and science of sexual recidivism risk assessment" since Dr. Proctor's original evaluations in 2004 and 2005. Dr. Proctor used a "clinically adjusted actuarial approach (CAAA)" to conclude that respondent's mental disorder made it substantially probable that he would engage in acts of sexual violence.

According to Dr. Abbott, the theory of CAAA has not been scientifically supported. Similarly, Dr. Proctor completed the "Static-99" test, which has since been replaced by the "Static-99R." Respondent scored a four on the "Static-99R" test, which indicated a predicted sexual recidivism rate of 12.9%.

¶ 27        Dr. Abbott also employed the "Stable-2007" test, used to assess dynamic risk factors among sexual offenders living in the community under conditional release. Dr. Abbott conceded that the validity and the reliability of the "Stable-2007" test has not been tested on offenders in custody as long as respondent and that his dynamic risk will likely change if the court grants conditional release. Dr. Abbott assigned respondent a risk score of 7 out of 26, which "falls about midpoint in the moderate score range," but did not elaborate regarding the implications of respondent's score.

¶ 28        Ultimately, Dr. Abbott opined that, "respondent no longer suffers from a legally defined mental disorder based on changes in circumstances associated with age-related modifications in his sexual and psychological functioning and change resulting from his progress in treatment" and that the conditional release program has sufficient treatment and supervision available to adequately manage his risk factors.

¶ 29        On October 2, 2017, Judge Watkins found sufficient probable cause to warrant an evidentiary hearing on whether respondent should be conditionally released. The hearing date was continued several times at respondent's request, and on October 16, 2018, the State once again moved for a finding of no probable cause, supported by Dr. Weitl's 2015 to 2018 reexamination reports.

¶ 30        Yet again, respondent refused to meet with Dr. Weitl for purposes of the reexamination in 2018. Dr. Weitl noted that respondent was in the second phase of the five-phase treatment program

but refused to attend sex offender specific groups and repeatedly refused to attend the phase two group (Disclosure Group) even though his treatment team recommended it. Although he was attending ancillary groups, there was no evidence that he used the groups to process his own behaviors or problematic issues. While respondent reportedly "regularly provided feedback" to other group members, he "took on a more observational role during the group process" and did not discuss any of his own issues. In March and June 2017, respondent "demonstrated other problematic behaviors and struggled to consistently manage his aggressive behavior." He received rule violations for fighting, interfering with facility operations, and insolence.

¶ 31        Dr. Weitl concluded that respondent's condition had not changed since his last reexamination and he had not made sufficient progress in treatment to be conditionally released. Her diagnoses and recommendations remained the same as those contained in her reexaminations from 2015 through 2017.

¶ 32        On October 16, 2018 before Judge Chiampas, the State requested that the court revisit Judge Watkins' prior finding of probable cause, based on Dr. Weitl's most recent reexamination report. Upon review of Dr. Weitl's reexamination reports from 2015 through 2018, as well as Dr. Abbott's findings, Judge Chiampas found no probable cause to warrant an evidentiary hearing on whether respondent was still an SVP and no probable cause to warrant a hearing on respondent's petition for conditional release. The judge stressed that respondent was only in the ancillary stages of treatment and that the prior probable cause order was entered because respondent had not received an evidentiary hearing "in a while," which was "not a legal basis." Nevertheless, the court reserved its ruling and allowed respondent's attorney to provide a transcript of the prior probable cause hearing for review. On January 17, 2019, Judge Chiampas confirmed that there were no changes in circumstances warranting an evidentiary hearing and that her previous order would

stand. Respondent timely appealed and, for the following reasons, we reverse the judgment of the trial court.

¶ 33    ANALYSIS

¶ 34    At the outset, we agree with respondent that this court has jurisdiction to review the circuit court's final judgment dated January 17, 2019, pursuant to Illinois Supreme Court Rule 303 (eff. July 1, 2017).[1] Respondent also admittedly provided the wrong case number for the order appealed from and the wrong case number was occasionally used on various trial court orders. We also agree with respondent that these scrivener's errors do not defeat our jurisdiction. *In re Detention of Kelley,* 2019 IL App (1st) 162184, ¶ 49 (where a scrivener's error does not impede the court's ability to ascertain from the record the order appealed from, it does not create a fatal defect).

¶ 35    Turning to the merits of respondent's appeal, he contends that: (1) he is entitled to an evidentiary hearing to determine whether he remains an SVP, pursuant to section 65(b)(1) of the Act and (2) he is entitled to an evidentiary hearing on his petition for conditional release pursuant to section 60(c) of the Act. Alternatively, he argues that an evidentiary hearing is constitutionally required by the due process clause of the Fourteenth Amendment. The Act allows for the involuntary commitment of "sexually violent persons" by the DHS for "control, care and treatment until such time as the person is no longer a sexually violent person." 725 ILCS 207/40(a)(West 2018). A "sexually violent person" is defined as "a person who has been convicted of a sexually

---

[1] During the probable cause hearing on November 5, 2018, the trial court explicitly reserved its ruling to allow respondent to provide a transcript from the earlier proceedings on October 2, 2017. On January 17, 2019, the court had an opportunity to review the transcript and confirm its findings, absolutely and finally resolving the issue of probable cause and disposing of all issues presented by the parties. See *Phoenix Capital, LLC v. Tabiti*, 2016 IL App (1st) 162686, ¶ 6 (Emphasis added) (A final order or judgment, for purposes of filing a timely notice of appeal, requires a determination by the trial court on the issues presented by the pleadings which ascertains and fixes *absolutely* and *finally* the rights of the parties to the litigation.)

violent offense . . . and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." *Id.* § 5(f).

¶ 36　　　There are two sections of the Act at issue and we will address them in turn. After a person has been committed under the Act, DHS is responsible for evaluating the individual's mental condition within six months of the initial commitment and at least annually thereafter. *Id.* § 55(a). The purpose of the periodic examinations is to determine whether: (1) the person has made sufficient progress in treatment to be conditionally released and (2) the person's condition has so changed since the most recent reexamination that he is no longer a sexually violent person. *Id.* At the time of the reexamination, the committed person may request that the court appoint a qualified expert to examine him. *Id.* Whenever a periodic examination has been conducted, the committed person receives notice of the right to petition the court for discharge. *Id.* § 65(b)(1). Where, as here, the person does not affirmatively waive that right, the trial court must set a probable cause hearing to determine whether the condition of the committed person has so changed that he is no longer an SVP. *Id.; In re Detention of Stanbridge*, 2012 IL 112337, ¶ 51.

¶ 37　　　The burden is on respondent to establish a plausible account on each of the required elements to assure the court that there is a substantial basis for discharge. *Stanbridge*, ¶ 62. In making that determination, the trial judge must consider all reasonable inferences that can be drawn from the facts in evidence but must not choose between conflicting facts or inferences or engage in a full and independent evaluation of an expert's methodology. *Id*. Post-commitment probable cause hearings are intended to be preliminary in nature, a summary proceeding to determine essential or basic facts as to probability while remaining cognizant of the respondent's liberty rights. (Internal quotations omitted.) *Id.* ¶ 54. Whether respondent has met the probable cause threshold is an issue of law, which we review *de novo*. *Id.* ¶ 56.

¶ 38        Probable Cause Hearing Pursuant to 725 ILCS 207/65

¶ 39        To support a finding of probable cause under section 65(b)(1) of the Act, the committed person bears the burden to present sufficient evidence to warrant a hearing on whether the person is still a sexually violent person. 725 ILCS 207/65(b)(1). In other words, he must show that he no longer meets the elements for commitment: (1) he no longer has a mental disorder or (2) he is no longer dangerous to others because the person's mental disorder no longer creates a substantial probability that he will engage in acts of sexual violence. 725 ILCS 207/5(f); *Stanbridge*, 2012 IL 112337, ¶ 68. Ultimately, the individual must present some plausible evidence that demonstrates a change in the circumstances that led to the original finding that he was an SVP. *Stanbridge* 2012 IL 112337, ¶ 72. This could include a change in the committed person, a change in the professional knowledge and methods used to evaluate a person's mental disorder or risk of reoffending, or a change in the legal definitions of a mental disorder or a sexually violent person. *Id.*

¶ 40        We find this court's most recent opinion in *Kelley*, 2019 IL App (1st) 162184 instructive in this case. In *Kelley*, respondent was convicted of raping two women and, while on parole in 1977, was convicted of deviate sexual assault. In 2007, a jury found that respondent was an SVP under the Act and he was committed to DHS. *Id.* ¶ 4. He was reevaluated annually and in 2015 and 2016, the State filed motions for findings of no probable cause, supported by 2015 and 2016 reexamination reports from Dr. Steven Gaskell. *Id.* ¶¶ 4-5. In both reports, Dr. Gaskell opined that respondent suffered from: (1) other specified paraphilic disorder, sexually attracted to nonconsenting females, (2) cannabis use disorder, in a controlled environment and (3) antisocial personality disorder. *Id.* ¶¶ 8, 17. He recommended that respondent continue to be found an SVP. *Id.* In the 2016 report, respondent received a score of five ("moderate-high") on the Static-99R, indicating a recidivism rate of 21.2 percent in 5 years, and five on the Static-2002R ("moderate"),

indicating a recidivism rate of 19.1 percent in 5 years. *Id.* ¶ 21. Dr. Gaskell also noted several additional risk factors that contributed to respondent's risk of recidivism such as his deviant sexual interest, his impulsiveness, and his substance abuse. *Id.* ¶ 23.

¶ 41        Respondent had not participated in sex offender specific treatment but had participated in some ancillary groups. *Id.* ¶ 24. In the year prior to the 2015 examination, respondent received a warning for disobeying an order, two minor rule violations for insolence, and a major rule violation for interfering with facility operations. *Id.* ¶ 18. In the year prior to the 2016 examination, respondent had also received a major rule violation for interfering with facility operations. *Id.* ¶ 24. Dr. Gaskell opined that it was substantially probable that respondent would engage in acts of sexual violence in the future. *Id.* ¶ 25.

¶ 42        Respondent filed a petition for discharge, supported by a report from Dr. Brian Abbott, in which Dr. Abbott opined that respondent was no longer an SVP. Dr. Abbott concluded that respondent "no longer suffer[ed] from a legally defined mental disorder based on changes in circumstances associated with age-related modifications in his sexual and psychological functioning, and physical health." *Id.* ¶ 27. He believed that respondent's personality disorder had remitted, that age related factors led to the remission of his deviant sexual behaviors, and that respondent reported a decline in his sexual drive which was supported by records indicating he had not acted in sexually inappropriate or illegal ways since his commitment. *Id.* ¶ 29. Dr. Abbott attributed these changes to respondent's improved executive functions associated with advancing age, allowing him to better deliberate over the consequences of his behavior before acting and refrain from acting in sexually violent ways. *Id.* ¶ 30. Based on his Static-99R analysis, Dr. Abbott found a five-year rate of recidivism between 15.2 percent and 20.5 percent. *Id.* ¶ 34. After reviewing the reports, the trial court found no probable cause to warrant an evidentiary hearing.

¶ 43        Respondent moved for reconsideration, providing an updated report from Dr. Abbott, in which he noted that respondent had undergone eight weeks of radiation therapy for prostate cancer and no longer experienced sexual urges. *Id.* ¶ 39. While respondent's motion was pending, the State filed another motion for a finding of no probable cause, based on Dr. Gaskell's 2017 reexamination. *Id.* ¶ 42. Dr. Gaskell's report was similar to his prior reports and he continued to conclude that respondent was at a substantial risk of sexual re-offense. *Id.* The trial court denied respondent's motion to reconsider and granted the State's motion for a finding of no probable cause, stating that respondent "has a long history of sexually offending and he has a long history of not taking any positive steps to do anything about that." *Id.* ¶ 44.

¶ 44        We reversed the trial court's finding of no probable cause, concluding that, based on Dr. Abbott's report, respondent met his "very low burden" to show probable cause to advance to an evidentiary hearing. *Id.* ¶ 62. "Although a comparison of Dr. Gaskell's and Dr. Abbott's reports indicate[d] that the experts substantially disagree[d] on several issues, we [would] not weigh conflicting evidence and choose between expert opinions." *Id.* ¶ 65.

¶ 45        Likewise, in the instant case, respondent has met the very low burden necessary to show probable cause to advance to an evidentiary hearing. In Dr. Abbott's report, he determined that respondent no longer suffers from a mental disorder and, if he does, that his disorder no longer creates a substantial probability that he will engage in acts of sexual violence. Dr. Abbott noted that respondent had "not experienced recurrent, intense, sexually arousing urges or sexual fantasies involving prepubescent males since his commitment date." He asserted that respondent had made a "turning point" in his recovery when he empathized with his victims and that his empathy and understanding of the motivations for his sexual offending behavior are clinically associated with a reduced risk for sexual re-offense." Although respondent is currently 54 years old, while the

respondent in *Kelley* was 64 years old, Dr. Abbot noted that his sexual drive had diminished, which was consistent with advancing age. When compared to the respondent in *Kelley*, respondent had a lower likelihood of recidivism (12.9%) based on his Static-99R score of four and had similarly "demonstrated improvement in his judgment, reasoning, and impulse control . . . associated with advancing age" and did not act in sexualized ways to cope.

¶ 46      Although a comparison of Dr. Wetil's and Dr. Abbott's findings show that the experts substantially disagree on numerous issues, we will not "weigh conflicting evidence and choose between expert opinions" at this preliminary stage. *Stanbridge*, 2012 IL 112337, ¶ 64. Based on Dr. Abbott's report, we find that respondent has presented at lease some plausible evidence of changed circumstances from the time he initially stipulated to the SVP designation in March 2006.

¶ 47      The State attempts to distinguish *Kelley* from the instant matter on the basis that the respondent in *Kelley* suffered a loss of sexual functioning due to radiation treatment for prostate cancer; however, this was not crucial to Dr. Abbott's conclusions regarding whether respondent remained an SVP nor to our analysis. Indeed, in *Kelley*, we noted that respondent had provided sufficient evidence to warrant a probable cause hearing even before the court was advised of respondent's radiation therapy. Accordingly, we conclude that respondent is entitled to an evidentiary hearing pursuant to section 65 of the Act.

¶ 48      Probable Cause Hearing Pursuant to 725 ILCS 207/60(c)

¶ 49      Respondent also argues that he is entitled to an evidentiary hearing on his petition for conditional release, pursuant to section 60(c) of the Act. Under this section, the court must hold a hearing to determine whether probable cause exists "to believe the person has made sufficient progress in treatment to the point where he or she is no longer substantially probable to engage in acts of sexual violence if on conditional release ***." 725 ILCS 207/60(c) (West 2018). Again,

the respondent must present some plausible evidence of a change in the circumstances that led to the initial SVP finding. *In re Commitment of Smego*, 2017 IL App (2d) 160335.

¶ 50     As discussed *supra,* respondent's failure to meaningfully participate in sex offender specific treatment and his insistence on only attending ancillary treatment groups is extremely troubling. Without more, we would find that respondent failed to present sufficient evidence to support a finding of probable cause.

¶ 51     In denying respondent's petition for conditional release, the trial court relied primarily on *Commitment of Smego*, 2017 IL App (2d) 160335, in which respondent's progress in treatment was insufficient to establish probable cause where he was only in the second stage of the five-stage treatment program, like the respondent in this case. However, the court in *Smego* observed that respondent's expert, Dr. Gaskell, gave him more favorable scores on actuarial assessments based primarily on his disagreement with the State's experts' methodologies. *Id.* ¶ 28. Dr. Gaskell's "differences with [the State's experts] went to the validity of the earlier adjudications of respondent's risk level and had no independent significance beyond calling into question judicial decisions that had [already] been settled ***." *Id.* ¶ 28. Moreover, respondent contended that his age was a protective factor, but made no mention of how his age alone would create probable cause to believe he was no longer substantially probable to reoffend if released. *Id.* ¶ 29. In this case, Dr. Abbott's report establishes at least a plausible account that respondent is no longer likely to engage in future acts of violence based on his alleged progress in treatment.

¶ 52     Accordingly, we remand this matter for the trial court to conduct an evidentiary hearing to determine whether respondent remains a sexually violent person, and if necessary, a conditional release hearing.

¶ 53　　Based on the foregoing, we need not reach respondent's alternative argument, that an evidentiary hearing is required by the due process clause of the fourteenth amendment to the United States Constitution. See *In re E.H.*, 224 Ill. 2d 172, 178 (2006) ("cases should be decided on nonconstitutional grounds whenever possible, reaching constitutional issues only as a last resort.")

¶ 54　　CONCLUSION

¶ 55　　For the reasons set forth herein, we reverse the judgment of the trial court finding no probable cause for an evidentiary hearing pursuant to 725 ILCS 207/65(b)(2) and 725 ILCS 207/60(c) and remand the case for further proceedings consistent with this order.

¶ 56　Reversed and remanded.