2024 IL App (1st) 230028-U

FIRST DISTRICT,
FIRST DIVISION
March 28, 2024

No. 1-23-0028

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| IN RE THE COMMITMENT OF VINCENT PIERONI | ) ) ) | Appeal from the Circuit Court of |
| (People of the State of Illinois, | ) ) | Cook County, Illinois. |
| Petitioner-Appellee, | ) ) | No. 05 CR 80008 |
| v. | ) ) | Honorable |
| Vincent Pieroni, | ) ) | Arthur Willis, Judge Presiding. |
| Respondent-Appellant). | ) | |

_____

JUSTICE COGHLAN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

**ORDER**

¶ 1    *Held:*  Evidence was sufficient to prove that respondent remains a sexually violent person as defined in the Sexually Violent Persons Commitment Act and has not made sufficient progress in treatment to be conditionally released.

¶ 2    In March 2006, respondent Vincent Pieroni was found to be a Sexually Violent Person (SVP) pursuant to the Sexually Violent Persons Commitment Act (725 ILCS 207/1 *et seq.* (West 2004)) (SVP Act) and committed to the custody of the Department of Human Services (DHS). In

2022, the trial court denied respondent's petition for conditional release, finding that the State proved by clear and convincing evidence that respondent is still an SVP and has not made sufficient progress in treatment so that he is no longer substantially probable to engage in acts of sexual violence. For the reasons that follow, we affirm.

¶ 3                                    BACKGROUND

¶ 4        In 2006, respondent stipulated that he was an SVP under the SVP Act based on multiple prior convictions for sexually violent offenses and an expert psychologist's opinion that he had a mental disorder that made him substantially probable to engage in future acts of sexual violence. See *In re Commitment of Pieroni*, 2020 IL App (1st) 190985-U, ¶¶ 4-13 (*Pieroni I*). The circuit court entered a judgment that respondent was an SVP and committed him to the DHS. *Id.* ¶¶ 2, 14.

¶ 5        In 2017, respondent petitioned the circuit court for conditional release (CR), attaching a report from Dr. Brian Abbott, who opined that respondent no longer suffers from a qualifying mental disorder and is not substantially probable to reoffend. On January 17, 2019, the circuit court found no probable cause to warrant an evidentiary hearing on whether respondent was still an SVP and no probable cause to warrant a hearing on respondent's petition for CR. *Id.* ¶ 32. We reversed, finding that respondent "has presented at least some plausible evidence of changed circumstances from the time he initially stipulated to the SVP designation in March 2006" (*id.* ¶ 46) and was therefore entitled to an evidentiary hearing.

¶ 6        On remand, with the parties' agreement, the circuit court held a hearing on May 19, 2022 to determine both whether respondent remained an SVP and, if so, whether he was entitled to CR. The State presented testimony from Dr. Kimberly Weitl, and respondent presented

testimony from Abbott. Both experts had previously prepared reports that were admitted into evidence at the hearing.

¶ 7                                                            Weitl's Testimony

¶ 8          Weitl, a forensic psychologist employed by DHS, was assigned to respondent's case in 2012. She opined that respondent continued to suffer from a mental disorder that made him substantially probable to reoffend and had not made sufficient progress in treatment to be conditionally released. Her opinion was based on records of respondent's criminal, treatment, medical, and behavioral history, his prior SVP evaluations, and a 2017 interview with respondent, which was the only time he agreed to speak with her. She did not interview or communicate with him in 2021 because of a facility-wide quarantine due to the COVID-19 pandemic.

¶ 9          Regarding respondent's criminal history, Weitl testified that in 1987, respondent committed, and was later convicted of, acts of sexual violence against two boys whom he was babysitting: he anally raped an 8-year-old, and, on a separate occasion, he fondled the penis of a 10-year-old. Respondent was released on parole in 1990 and committed (and was convicted of) another act of sexual abuse in 1992, which indicated to Weitl that "his deviant sexual urges were such that he could not maintain himself while on supervised release."

¶ 10         In 1993, while on probation for the 1992 offense, respondent committed (and later pleaded guilty to) sexually violent offenses against four boys. Specifically, he fondled a 13-year-old boy's penis on 20 separate occasions and threatened to shoot him if he reported the abuse. Respondent also anally raped another 13-year-old boy, using force. On another occasion, he persuaded a 12-year-old boy to spend the night in his home and fondled the boy's penis while the boy slept. He also threatened to hurt both of these boys if they reported the incidents. Finally,

respondent sexually abused a 16-year-old boy on several occasions by rubbing his penis between the boy's legs and by persuading the boy to penetrate respondent's anus with the boy's penis.

¶ 11        Weitl further testified that respondent had a history of substance abuse "with his drug of choice being cocaine," and he acknowledged being under the influence when committing some of his offenses, which she identified as a risk factor for reoffending. In addition, respondent had "a long history of mental illness": he was diagnosed with bipolar disorder, had been hospitalized twice for psychiatric treatment, and had been prescribed psychotropic medications for "most of his life."

¶ 12        Weitl also considered respondent's behavior while in custody. Since December 2005, respondent has been detained at a DHS facility "designed for sexually violent persons that provides him with secure care and sex offender treatment." At the facility, respondent has committed multiple disciplinary infractions, including possession of pornography depicting violent sex scenes, but "[h]is most recent [infraction] was in 2017. So for the last several years he has been okay."

¶ 13        Detainees at the DHS facility are given access to a five-step treatment program consisting of (1) treatment readiness, (2) disclosure, (3) analysis, (4) developing a relapse prevention plan and wellness plan, and (5) CR readiness. According to Weitl, respondent has not completed step one and has declined to begin step two, which Weitl characterized as "when they actually begin treatment." A phase two treatment group consists of approximately ten men who discuss their prior offenses in detail, including victim types and specific types of penetration. In his 2017 interview with Weitl, respondent stated that he has not moved to phase two out of concern "that he might not understand the treatment concepts and that *** he might need a specialized group."

¶ 14        Weitl acknowledged that, according to Abbott's 2021 report, respondent is not participating in sex offender treatment because he has post-traumatic stress disorder (PTSD) due to past sexual abuse by his brother. Respondent never said as much to Weitl; if he had, Weitl would have suggested that he tell his treatment team, since "[a] lot of the men" at the facility "have trauma backgrounds" and the treatment program is "designed with that in mind." On cross-examination, Weitl admitted that hearing fellow detainees' descriptions of their sexual offenses could trigger someone who had been sexually abused. She nevertheless opined that respondent's past trauma did not mean he should not participate in sex offender treatment, "because that issue is going to stay unresolved if he doesn't get into treatment and work through that stuff."

¶ 15        The DHS facility also provides "ancillary groups," of which respondent has completed a wide selection, including dialectical behavior therapy, act mindfulness, healthy relationships, decision-making models, and good lives exploration. Weitl testified that these groups are not part of sex offender treatment "[b]ecause [participants] are not required to process their sex offending behavior in those groups. *** [F]or the most part they are dealing with a different behavior, anger, whatever else the issue is being discussed."

¶ 16        Weitl diagnosed respondent with pedophilic disorder, defined as attraction to prepubescent children that is "demonstrated in recurrent, sexually arousing fantasies, urges, or behaviors involving children age 13 or younger," and "other specified paraphilic disorder" in that he is sexually attracted to nonconsenting males between 14 and 16. She characterized these as "chronic lifelong disorders" that are unlikely to resolve without treatment: "Similar to any sexual interest, they don't go away. *** They can become less intense, but the interest in children won't go away." These conditions impact respondent's ability to control his sexually violent behaviors

because "[t]he urges are to such a degree that even with legal and treatment interventions he continued to engage in that behavior."

¶ 17    Weitl conducted a risk assessment of respondent using the Static-99R which is "the most commonly used sex offender risk assessment tool in the world." Respondent scored in the 79th percentile, placing him in the "above-average risk category" for being charged with or convicted of another sexual offense, although she did not know the base recidivism rate and did not consider it important.

¶ 18    Weitl also considered "empirical risk factors" that are not included in the Static-99R. In aggravation, she stated that respondent had a history of substance abuse and employment instability; he has deviant sexual interests; he has intimacy deficits, *i.e.*, due to lack of intimacy with same-age adults, he "is getting his needs met through children"; he has multiple paraphilic disorders, giving him a larger victim pool; he is "not motivated for treatment"; he has difficulty managing his emotions; and he has demonstrated a lack of success with conditional release by reoffending while on probation and on parole. She acknowledged that the lack of intimacy and employment instability were "historical" and that respondent no longer had a substance abuse disorder.

¶ 19    Weitl did not find any protective factors applied to respondent. She did not consider respondent's age of 55 to reduce his risk of reoffending because "especially with child victims, *** the decrease does not start occurring until after 60." Additionally, she did not consider his participation in ancillary groups to reduce his risk "[b]ecause he is not dealing with his sex offending behavior."

¶ 20    Based on the foregoing factors, Weitl opined that respondent was "substantially probable, or much more likely than not, to commit another act of sexual violence if not confined." She did

not recommend him for CR. To make such a recommendation, she would need to see "[t]hat he was genuinely and actively involved in core or sex offender specific treatment and that he had progressed to a point where [she] believe[d] it mitigated his risk. Or it could even change his status as an SVP if he is making sufficient progress."

¶ 21                                  Abbott's Testimony

¶ 22          Abbott, a licensed clinical psychologist, is a private practitioner who conducts psychological evaluations of individuals in criminal and civil litigation. He evaluated respondent in 2016 and in 2021 and both times opined to a reasonable degree of psychological certainty that respondent was no longer an SVP. He further opined that, even if respondent was still an SVP, he had made sufficient progress in treatment that he was no longer substantially probable to engage in sexual violence if conditionally released. He based these opinions on clinical interviews with respondent in 2016 (in person) and in 2021 (remotely due to the COVID-19 pandemic), as well as respondent's criminal history and his medical, clinical, and treatment records while in detention.

¶ 23          Abbott testified that respondent is currently in phase two of sex offender treatment, as reflected in his master treatment plan records from 2019 and 2020, although he has stopped participating due to his PTSD. His treatment records make "regular mention" of his PTSD and the fact that "participating in the disclosure group and hearing other offenders talking about their sexual offense history *** would trigger strong emotional reactions and intrusive recollections about his past sexual victimization."

¶ 24          Respondent has completed multiple ancillary groups, including dialectical behavioral training, "a type of cognitive therapy that helps individuals understand their emotions better and learn to manage their emotions effectively." As a result, respondent has "improved emotional

and behavioral control." He has learned to manage his symptoms of PTSD, understand what led him to commit his sexual offenses, and develop "a good capacity for empathy towards his victims" that he lacked when he committed the offenses. Respondent's medication is "an integral part of his sex offender treatment": he is taking mood-stabilizing medication, antidepressants, and medication for behavioral control.

¶ 25        Abbott opined that respondent no longer suffers from pedophilic disorder. Although the DSM-5, published in 2013, classifies pedophilic disorder as a lifelong condition, Abbott cited studies from 2015 and 2018 indicating that not everyone experiences it as lifelong. Those with lifetime pedophilic disorder display "sexual offense analog behaviors" while in custody (*e.g.*, keeping cutout photos of children, establishing relationships with immature-looking detainees)— which respondent has not done.

¶ 26        According to Abbott, respondent's pedophilic disorder was linked to his PTSD: he "cope[d] with [his] sexual victimization by sexually abusing others." Due to dialectical behavior therapy, he has learned to manage his symptoms of PTSD and is "no longer having the types of strong emotional reactions that precipitated sexual fantasizing towards children." Additionally, he has developed "a strong sense of empathy for the victims that he sexually abused" and "a psychological connection between how he felt as a victim of childhood sexual abuse and how his victims felt when he sexually abused them." As a result, thinking about his victims no longer evokes arousal but "disgust and distress." Respondent also displays "age-related improvement in reasoning, judgment, and impulse control."

¶ 27        Abbott also opined that respondent's sexual urges were no longer "affecting his emotional or volitional capacity in a way that predisposes him to *** acts of sexual violence." Individuals in custody who have serious difficulty controlling sexually violent behavior will

repeatedly display sexual offense analog behavior despite sanctions. Such behavior was not present in respondent's record. Although he had received a disciplinary ticket for possession of pornography approximately six years prior, Abbott did not consider it indicative of current difficulty in controlling sexual behavior.

¶ 28    Abbott conducted a risk assessment of respondent using the Static 99-R and the Stable-2007, a standardized actuarial instrument that includes "dynamic risk factors" and "accounts for more sources of sexual recidivism risk than the Static-99R alone." He gave respondent the same Static-99R score as did Weitl, which he said corresponded to a five-year recidivism rate of 9.2%, although adjusting for respondent's age gave a "more accurate" rate of 12.9%.

¶ 29    The Stable-2007 "consists of 13 items that *** have some statistical relationship with sexual recidivism": significant social influences, relationship stability, emotional identification with children, hostility towards women, general social rejection, lack of concern for others, impulsive acts, poor problem-solving skills, negative emotionality, sex drive/preoccupation, sex as coping, deviant sex preferences, and cooperation with supervision. In 2016, respondent scored a seven, placing him in the moderate risk category. In 2021, he scored a four, placing him in the lowest risk category. Adjusting for the Stable-2007 score, Abbott estimated respondent's five-year recidivism rate at 7.5%.

¶ 30    Taking the foregoing into account, Abbott recommended respondent for discharge or, in the alternative, CR. He opined that respondent was not substantially probable to engage in sexual violence if released. He further stated that CR would help respondent to get the care he needed, since releasees have mandatory group and individual therapy, the latter of which is "of paramount importance" to respondent since it would allow him to participate without triggering symptoms of PTSD.

¶ 31                                   Decision

¶ 32        Following arguments by counsel, the trial court found that respondent was still an SVP,

stating that "Dr. Weitl testified clearly and credibly" that respondent suffers from "paraphilic

disorder and other specified paraphilic disorder" based on respondent's "history and the pattern

of his behavior over six years." The court additionally denied CR based on respondent's failure

to complete sex offender treatment while in custody. Although the court acknowledged that

"[t]he plain language of the statute does not specify sex offender treatment," it was persuaded by

the State's argument "that he's made a choice as to what treatment programs he wishes to engage

in and *** that he's not engaging in the hard work of the specific sex offender treatment that is

needed to allow him to progress to the point where he can be conditionally released." The court

concluded: "This Court cannot and will not state that an individual who has not gone through any

sex offender treatment is ready for conditional release. I concur with Dr. Weitl."

¶ 33        On denial of respondent's motion for reconsideration, the court clarified its decision,

acknowledging that respondent has completed "a number of other treatment programs" but

finding them "not sufficient" to qualify respondent for conditional release. The court further

considered that respondent "had issues which stopped him from being able to engage in

treatment," but "those issues needed to be addressed *** in order for him to reach the next step

[in treatment]."

¶ 34                                   ANALYSIS

¶ 35        Civil commitment is not constitutionally permissible without a showing that an individual

has serious difficulty controlling sexually violent behavior. *Kansas v. Crane*, 534 U.S. 407, 413

(2002). At a discharge trial, the State has the burden of proving by clear and convincing evidence

that the respondent is still an SVP (725 ILCS 207/65(2) (West 2020)), which requires that the

individual (1) has a qualifying criminal conviction and (2) has a mental disorder (3) that makes him substantially probable to engage in acts of sexual violence (725 ILCS 207/15(b) (West 2020)). At a conditional release hearing, the State has the burden of proving by clear and convincing evidence "that the person has not made sufficient progress in treatment to the point where he or she is no longer substantially probable to engage in acts of sexual violence if on conditional release." 725 ILCS 207/60(d) (West 2020). The term "substantially probable" means much more likely than not. *In re Commitment of Gavin*, 2019 IL App (1st) 180881, ¶ 43.

¶ 36       Respondent argues that the evidence was insufficient to prove that (1) he is still an SVP and that (2) he has not made sufficient progress in treatment to be conditionally released. He further argues that (3) Weitl's testimony should have been stricken under section 55(b) of the SVP Act (725 ILCS 207/55(b) (West 2020)) because she did not take reasonable steps to engage him in the assessment process.

¶ 37       In reviewing the sufficiency of the evidence, we ask whether, viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the elements of the SVP Act proven beyond a reasonable doubt. *In re Commitment of Fields*, 2014 IL 115542, ¶ 20. We review the trial court's factual findings under the manifest weight of the evidence standard (*In re Commitment of Sandry*, 367 Ill. App. 3d 949, 977-978 (2006); *People v. Donath*, 2013 IL App (3d) 120251, ¶ 38), meaning that we defer unless "an opposite conclusion is clearly apparent" (*In re Estate of Cuneo*, 334 Ill. App. 3d 594, 598 (2002)). Because the trial court is in the best position to observe the conduct and demeanor of the witnesses, we will not substitute our judgment regarding the credibility of the witnesses, the weight to be given to the evidence, or the inferences to be drawn therefrom. *People v. Guerrero*, 2012 IL 112020, ¶ 19. We review

issues of law *de novo*. *People v. Daniels*, 187 Ill. 2d 301, 307 (1999); *People v. Carlson*, 185 Ill. 2d 546, 551 (1999).

¶ 38                                   Presence of a Mental Disorder

¶ 39        Respondent argues that the evidence was insufficient to prove that he suffers from a mental disorder, defined in the SVP Act as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 207/5(b) (West 2020).

¶ 40        Weitl diagnosed respondent with two mental disorders: (1) pedophilic disorder and (2) "other specified paraphilic disorder, non-consent (males, aged 14 to 16)." She based her diagnosis of pedophilic disorder on respondent's extensive criminal history, including numerous sexual assaults that he committed while on probation or parole, indicating that "his deviant sexual urges were such that he could not maintain himself while on supervised release." She further testified that pedophilic disorder is a chronic, lifelong condition and that "[s]imilar to any sexual interest, *** the interest in children won't go away." In support, Weitl cited the DSM-5, which classifies pedophilic disorder as lifelong. Although Abbott argued that this was incorrect based on recent research, resolving this conflict in the evidence was the province of the finder of fact. See *Guerrero*, 2012 IL 112020, ¶ 19.

¶ 41        Respondent argues there was no showing that he *currently* suffers from pedophilic disorder, since his most recent crime was in 1993, he does not have access to children while in detention, and there was no evidence introduced of sexual offense analog behavior on his part. (As Weitl acknowledged, his most recent disciplinary infraction was in 2017, and he "has been okay" for "the last several years.") However, "[c]ourts have consistently upheld SVP findings despite the absence of sexually offensive activity while in the controlled environments of prison

or the TDF." *In re Commitment of Evans*, 2021 IL App (1st) 192293, ¶ 53 (citing *In re Detention of White*, 2016 IL App (1st) 151187, ¶ 60 (affirming SVP finding despite defendant's argument that he had manifested no symptoms or conduct evidencing a mental disorder in the past 30 years in custody)); see also *In re Detention of Lieberman*, 379 Ill. App. 3d 585, 602 (2007) (evidence held sufficient despite the lack of any evidence of nonconsensual sexual activity in the previous 26 years)).

¶ 42        Respondent further argues that Weitl "failed to account for" his PTSD, which, according to Abbott, was the cause of his attraction to children (and, therefore, managing his symptoms enabled him not to experience that attraction). Weitl rejected this theory in her testimony, stating that she did not include respondent's PTSD diagnosis in her evaluation because it was not a mental disorder under the SVP Act and she did not view it as impacting respondent's pedophilic disorder.

¶ 43        As for Weitl's diagnosis of other specified paraphilic disorder (OSPD) for having sexual interest in males aged 14 to 16, the record indicates that respondent had one 16-year-old victim. However, Weitl denied that she based her diagnosis on that single victim, stating:

> "[T]here were so many 13-year-olds, and I was concerned that there was a chance they could be postpubescent. So I was trying to capture those victims in a greater light. I could have easily just left that diagnosis off like I did in 2012. I only added it trying to better describe [respondent]."

She later reiterated that she made the diagnosis based on the "chance[]" that some of the 13-year-old victims might have been "almost 14" and stated: "I didn't need to do that. I shouldn't have done it clearly because it's just made confusion. *** Pedophilic disorder is his main diagnosis."

¶ 44       Due to Weitl's admission that her diagnosis of OSPD was based on speculation as to the "chance" that some of respondent's 13-year-old victims might have been "postpubescent" or "almost 14," we find the evidence was insufficient to support the OSPD diagnosis. See *People v. Crane*, 2020 IL App (3d) 170386, ¶ 29 (speculative inferences are not permissible in reviewing sufficiency of the evidence claim). However, this does not impact Weitl's "main diagnosis" of pedophilic disorder, which, as discussed, was adequately supported by the evidence.

¶ 45       As for whether respondent's pedophilic disorder affects his emotional or volitional capacity in ways that predispose him to engage in acts of sexual violence, this was the subject of conflicting expert testimony. Abbott testified that respondent displayed "improved emotional and behavioral control" due to therapy and medication, as evidenced by his lack of sexual offense analog behaviors and his clean disciplinary record since 2017. In contrast, Weitl testified that respondent was predisposed to engage in acts of sexual violence based on his repeated offenses while on parole in 1992 and on probation in 1993, plus his lack of progression in sex offender specific treatment. She opined that his disorder "is going to stay unresolved if he doesn't get into treatment and work through that stuff." As in *Evans*, "[t]he trial court expressly resolved the competing expert testimony by finding the State's witnesses more credible. We have no basis to question that determination and will not substitute our judgment for the trial court's judgment." *Evans*, 2021 IL App (1st) 192293, ¶ 56.

¶ 46                         Substantial Likelihood to Reoffend

¶ 47       The State also bore the burden of proving that respondent was "substantially probable," *i.e.*, "much more likely than not" to reoffend. (Internal quotation marks omitted.) *Gavin*, 2019 IL App (1st) 180881, ¶ 43. This definition "cannot be reduced to a mere mathematical formula or statistical analysis"; instead, the finder of fact must make a "commonsense judgment" based on

"all factors that either increase or decrease the risk of reoffending." *In re Detention of Hayes*, 321 Ill. App. 3d 178, 188 (2001).

¶ 48    Both Weitl and Abbott gave respondent a score of 4 on the Static 99-R, which, according to Abbott, corresponds to a base five-year recidivism rate of 9.2%, adjusted for respondent's age to 12.9%. However, Weitl did not rely solely on the Static 99-R, but also considered dynamic aggravating and protective factors. See *White*, 2016 IL App (1st) 151187, ¶ 61 (affirming SVP finding where State's experts "did not rely solely on actuarial instruments, but also considered dynamic aggravating and protective factors"). In aggravation, Weitl cited "historical" factors of respondent's employment instability, intimacy deficits, and substance abuse, as well as his difficulty managing his emotions and his demonstrated lack of success with conditional release on multiple occasions. She further observed that respondent is "not motivated for treatment" and did not consider his completion of ancillary groups to be a protective factor because "he is not dealing with his sex offending behavior."

¶ 49    Respondent argues that Weitl's testimony was not credible because she did not explain how she was weighing each factor or how the factors in concert raised respondent's risk to the level of "substantially probable." He further argues that many of the factors were "disproven" or "undermined" because they were historical in nature and did not apply to his current situation in custody. This, again, is an invitation to reweigh the evidence. Weitl conducted a comprehensive and detailed risk analysis of respondent, on which she was vigorously cross-examined, and which the trial court found to be credible. We find the evidence was sufficient to prove that

respondent suffered from a qualifying mental disorder and was substantially probable to reoffend if released.[1]

¶ 50                               Sufficient Progression of Treatment

¶ 51        Respondent further argues that, even if he is still an SVP, the State failed to prove that he had not progressed sufficiently in treatment to be conditionally released.

¶ 52        The record reflects that respondent has largely declined sex offender specific treatment during his time in custody: he has not completed phase 1, the "treatment readiness" phase, and he has declined to participate in phase 2 disclosure groups. In his interview with Abbott, he attributed his lack of participation to his PTSD, but he did not inform Weitl or his treatment team of that fact. As discussed, there was conflicting testimony at trial as to the significance of his failure to progress in sex offender specific treatment—Abbott testified that respondent was able to work through his disorder via ancillary groups, while Weitl disagreed—but resolving that conflict was the province of the trial court.

¶ 53        Respondent asserts that Weitl's testimony was based on a misapprehension of the law, in that she said that he could only be conditionally released if he were no longer an SVP. This misstates Weitl's testimony. Weitl said that she would recommend respondent for release if "he was genuinely and actively involved in core or sex offender specific treatment *** to a point where [she] believe[d] it mitigated his risk." She further stated that if he made sufficient progress, "it could even change his status as an SVP." She did not describe lack of SVP status as a prerequisite for conditional release.

---

[1] Respondent's reliance on *In re Commitment of McCormack*, 2021 IL App (1st) 181930-U, is unpersuasive, since both experts in that case agreed that McCormack was "at a low statistical risk to reoffend" (*id.* ¶ 28), whereas in this case, both experts agreed that respondent's Static 99-R score places him in the "above-average risk category."

¶ 54     Respondent further argues that the trial court improperly based its ruling solely on his failure to participate in sex offender treatment, rather than the standard set forth in section 60(d) of the SVP Act. 725 ILCS 207/60(d) (West 2020) (conditional release petition "shall" be granted unless State proves "that the person has not made sufficient progress in treatment to the point where he or she is no longer substantially probable to engage in acts of sexual violence if on conditional release"). However, the court explicitly acknowledged and considered that "[t]he plain language of the statute does not specify sex offender treatment." The court found Weitl's testimony to be credible and clarified on denial of rehearing that it took respondent's completion of ancillary groups into account but did not consider them sufficient to qualify respondent for release. Accordingly, we find that the trial court did not misapprehend the applicable standard under the SVP Act, and the evidence was sufficient to prove that respondent has not made sufficient progress in treatment to be conditionally released.

¶ 55                    Failure to Engage Respondent in the Assessment Process

¶ 56     Respondent argues that the trial court erred by denying his motion to strike Weitl's testimony because she failed to take reasonable steps to engage him in the assessment process. We review the trial court's ruling for an abuse of discretion. *In re Tittlebach*, 324 Ill. App. 3d 6, 10 (2001).

¶ 57     Section 55(b) of the SVP Act (725 ILCS 207/55(b) (West 2020)) requires examinations to be conducted "in conformance with the standards developed under the Sex Offender Management Board Act," which are codified at Title 20, Part 1905 of the Illinois Administrative Code. In relevant part, section 1905.40 states that assessments "are most reliable and beneficial when evaluators *** strive to engage clients in the assessment process." 20 Ill. Adm. Code 1905.40(b) (eff. Jan. 1, 2017). Section 1905.50(a) requires evaluators to take "reasonable steps"

to "afford the client who is the subject of the assessment *** the opportunity to make an informed decision about participating in the assessment process." 20 Ill. Adm. Code 1905.50(a) (eff. Jan. 1, 2017).

¶ 58      Weitl did not interview respondent in conjunction with her 2021 assessment. She testified that she emailed "the individual at the facility who schedules the Zoom meetings" to request an interview with respondent and was told that he was "unavailable" because of a facility-wide quarantine. (The record is unclear as to why a quarantine would have precluded a Zoom interview.) Weitl did not ask when the quarantine would be over, nor did she ask to interview respondent after the quarantine or take any steps to notify him that he had lost the chance to interview with her. She admitted that she did not provide respondent an opportunity to make an informed decision about whether to participate in an interview with her in 2021.

¶ 59      Respondent moved to strike Weitl's testimony for failure to comply with section 55(b) of the SVP Act. Following arguments by the parties, the court asked respondent's counsel, "Are you affirmatively saying that your client would have participated in an interview with Dr. Weitl?" Counsel replied, "Well, Judge, I'm not saying that one way or another." Counsel acknowledged that he could have contacted Weitl to arrange an interview with his client and did not do so, but he argued that the statute placed the burden solely on Weitl. The court denied the motion to strike, finding that any failure by Weitl to comply with section 55(b) went to the weight of her testimony rather than its admissibility, and stating that it "w[ould] take it into consideration."

¶ 60      We do not find this ruling to be an abuse of discretion. See *In re Commitment of Sandry*, 367 Ill. App. 3d 949, 977 (2006) (allegation that expert's opinion was flawed because he did not interview SVP was relevant to its credibility and weight, not its admissibility). Respondent cites

no cases in which an evaluator's testimony was stricken under section 55(b) for failure to take reasonable steps to engage a subject in the evaluation process. *People v. Orth*, 124 Ill. 2d 326, 340 (1988), involving breathalyzer test results, is inapposite because the statute at issue in that case set forth prerequisites for the admissibility of such results, whereas section 55(b) of the SVP Act merely provides that examinations "shall" be conducted in accordance with the Sex Offender Management Board Act.

¶ 61                                             CONCLUSION

¶ 62          For the foregoing reasons, we affirm the judgment of the trial court.

¶ 63          Affirmed.